Linda M. PICKERING, Plaintiff,

v.

Shirley S. CHATER, Commissioner
of Social Security, Defendant.

No. 94 Civ. 8756 (DAB).

United States District Court,
S.D. New York.

Nov. 13, 1996.

Elyse J. Factor, Westchester/Putnam Legal Services, White Plains, NY, for Plaintiff.

Susan D. Baird, Assistant U.S. Attorney, New York City, for Defendant.

## ORDER

BATTS, District Judge.

On September 26, 1996, Magistrate Judge Andrew J. Peck issued a Report and Recommendation. The parties have not filed objections.

Magistrate Judge Peck granted the Commissioner's motion for judgment on the pleadings and denied Plaintiff's cross motion for judgment on the pleadings.

Having reviewed the Report and Recommendation and finding no clear error on the face of the record, the recommendations of Magistrate Judge Peck are hereby accepted and the Report and Recommendation dated September 26, 1996, is hereby adopted in its entirety. See Rule 72, Fed.R.Civ.P., Notes of Advisory Committee on Rules (citing Campbell v. United States Dist. Court, 501 F.2d 196, 206 (9th Cir.), cert. denied, 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974)).

Therefore, the action is dismissed with prejudice.

SO ORDERED.

## REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge:

Plaintiff Linda M. Pickering brings this action, pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") to deny her disability benefits. Both parties have cross-moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). For the reasons set forth below, I recommend that the Court grant the Commissioner's motion for judgment on the pleadings and deny Pickering's cross-motion.

## PROCEDURAL BACKGROUND

On April 3, 1991 and August 20, 1992, Pickering filed applications for Social Security Supplemental Security Income ("SSI") benefits. (Administrative Record filed by the Commissioner [hereafter, "R."], at 38–41.) The applications were denied initially (R. 52–54, 70–73) and on reconsideration (R. 58–60, 76, 87–90). Pickering subsequently requested a hearing before an administrative law judge ("ALJ"), which was conducted on April 12, 1994. (R. 17–37.) On June 23, 1994, the ALJ issued his decision finding that Pickering was not disabled. (R. 7–13.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Pickering's request for review on September 29, 1994. (R. 3–4.) This action followed. The issue before the Court is whether the Commissioner's decision that plaintiff Pickering was not disabled is supported by substantial evidence.

## FACTS

### Pickering's Testimony Before the ALJ

At the hearing before the ALJ on April 12, 1994, Pickering was represented by the same counsel representing her in this case. (R. 17–19.) Pickering testified that she was born July 1, 1957 and was a high school graduate. (R. 23.) She also started a course in word-processing at Monroe Junior College, but failed to complete it due to health problems. (R. 27.)

Pickering testified that she last worked for four months ending in March 1992 as a tem-

porary postal worker. (R. 24.) She sorted mail in the post office, which required mostly standing as well as occasional heavy lifting. (R. 24–25.) Prior to that, Pickering worked as a maintenance worker at an amusement park (Rye Playland) for three summers, ending with the summer of either 1987 or 1988. (R. 25.) The job required cleaning and standing with occasional sitting. (R. 25–26). Prior to that, Pickering worked for fast food restaurants (Burger King) as both a cashier and food preparer for six years; the job involved long periods of standing but no heavy lifting. (R. 26–27.)

Pickering also testified as to her medical condition. She testified that she left the Post Office because her high "blood pressure was out of control" and she could have gotten hurt by the heavy machinery on the job. (R. 28.) Pickering further testified that she experienced asthma attacks two or three times a week, mainly at night while sleeping, during which she had chest tightness and shortness of breath. (R. 29–31.) She received treatment for her asthma at the HIP Center once a month. (R. 31.) In addition, Pickering testified that she suffered from pain when walking and sitting caused by phlebitis; she takes Coumadin to treat her phlebitis, but only when she experiences pain in her legs. (R. 33–34.)

Pickering further testified that she can walk two blocks prior to experiencing leg pain or sit for 15 minutes before she would have to change positions to prevent leg pain. (R. 34.) Pickering appeared at the hearing carrying a seven pound baby, and was unsure whether she could lift anything heavier. (R. 35.) Pickering cared for the infant, her niece, with the help of her daughter. (R. 35.) On a typical day, she would cook, clean the house and go to the nearby store. (R. 35.) Pickering also attended church. (R. 35.) Her hobbies included reading, knitting and crocheting. (R. 35.)

### The Medical Evidence

Records from New Rochelle Hospital show that Pickering was hospitalized in June 1989 "because of pain in her lower right extremity." (R. 127.) The doctor noted that "[t]he pain was quite severe and she was admitted from the ER with a diagnosis of acute phlebi-

tis." (R. 127.) Her blood pressure ranged from 110/80 to 150/110. (R. 127.) A doppler study of the lower extremity veins revealed no evidence of deep vein thrombosis. (R. 136.) The final diagnosis was phlebitis of the right extremity and benign hypertension. (R. 127.) Pickering was released 10 days later with her condition "much improved." (R. 127.) Coumadin, an anticoagulant, and Minipress, an anti-hypertensive medication, were prescribed. (R. 127.)

Upon her admission to Mount Vernon Hospital in December 1990, a venogram revealed deep vein thrombosis. (R. 156.) Pickering responded well to therapy and her condition improved. (R. 156.) When Pickering signed out against medical advice on January 2, 1991, she was "seriously encouraged" to seek further treatment. (R. 156.)

Pickering was again admitted to Mount Vernon Hospital on January 5, 1991 for treatment of deep vein thrombosis. (R. 172.) The hospitalization was "completely unremarkable" and Coumadin was prescribed upon discharge. (R. 172.)

Pickering was next treated at Mount Vernon Hospital in June 1991. (R. 197.) Doppler flow studies of the extremity were negative for acute deep vein thrombosis. (R. 197.) The hospital record notes that the treating physician doubted Pickering had complied with the earlier Coumadin prescription. (R. 197.) Upon discharge, Pickering was in stable condition. Coumadin was again prescribed. (R. 197.)

Dr. David Pulver, a consultative examiner, saw Pickering on July 25, 1991. (R. 213.) Pickering told Dr. Pulver that her hypertension was controlled by diet alone, without medication. (R. 213.) Her blood pressure was 148/84. (R. 213.) Pickering told Dr. Pulver that she "gets infrequent asthma attacks," but still smoked approximately one-third of a pack of cigarettes per day. (R. 213.) Dr. Pulver's evaluation of her chest demonstrated that it was "resonant to percussion, [with] no rales, rhonchi, or wheezes." (R. 213.) X-rays revealed "[m]ild peribronchial changes indicative of bronchitis." (R. 214.) Her pulmonary function testing revealed "mild obstructive impairment with

normal results after administration of a bronchodilator." (R. 214.) On examination, Dr. Pulver found that Pickering was in no acute distress. (R. 213.) Dr. Pulver's impression was asthma and a history of hypertension and recurrent thrombophlebitis. (R. 214.)

Pickering was admitted to New Rochelle Hospital on April 29, 1992 and remained there through May 9, 1992. (R. 230–54.) A lung scan ventilation was consistent with pulmonary embolization. (R. 233.) A Doppler study of the lower extremity veins revealed no evidence of deep vein thrombosis. (R. 234.)

Pickering was admitted to New Rochelle Hospital again on June 24, 1992. (R. 255.) She was discharged on July 1, 1992, against medical advice. (R. 255.)

Pickering was admitted to New Rochelle Hospital on July 21, 1992. (R. 297.) The Hospital determined that no deep vein thrombosis existed. (R. 298, 309.) A lung scan perfusion demonstrated that no pulmonary embolism existed. (R. 310.) A chest x-ray revealed no evidence of active pulmonary infiltration or pleural effusion. (R. 308.) Pulmonary function tests revealed a mild diffusional defect, but no airway obstruction or pulmonary restrictive impairment. (R. 306)

Pickering received treatment at New Rochelle Clinic from July 1992 through early 1993. (R. 340–58, 360–62.) The doctor noted a history of pulmonary embolus, hypertension and asthma, with the latter requiring an emergency room visit on September 5 according to Pickering. (R. 344, 347.) Treatment included Coumadin and a steroid inhaler. (R. 344–45.) In August 1992, her blood pressure was noted to be "better controlled." (R. 345.) When examined on September 15, 1992, her lungs were clear bilaterally and her blood pressure was 150/96. (R. 348.) The doctor's assessment was controlled blood pressure and status post asthma attack. (R. 348.) Her prothrombin time was not at a therapeutic level. (R. 348.) When examined on October 13, 1992, her prothrombin time was still not at a therapeutic level. (R. 349.) The doctor considered this likely to be due to noncompliance with her Coumadin prescription. (R. 349.) On January 7, 1993, Pickering's blood pressure was 140/90. (R. 364.) The doctor noted that Pickering "may not be taking her own Coumadin," and discontinued the Coumadin prescription, instead prescribing aspirin. (R. 364–65.) On January 19, 1993, Pickering was seen for a new onset of diabetes and commenced taking Glucotrol. (R. 350.) Her blood pressure at this time was 120/90 and her lungs were clear. (R. 350.)

Pickering was again evaluated by Dr. Pulver on April 20, 1993. (R. 389.) Dr. Pulver noted that Pickering reported having required treatment in the emergency room several times for acute asthma attacks. (R. 389.) When Dr. Pulver examined her, she was in no acute distress. Her gait remained normal. (R. 389.) She had no inflammation or edema and her pulses were palpable to the dorsalis pedis bilaterally. (R. 390.) She was experiencing tenderness in her right calf. (R. 390.) Her blood pressure was 124/84. (R. 389.) Her chest was "resonant to percussion, [with] no rales, rhonchi or wheezes." (R. 389.) Pulmonary function test results reflected a mild restrictive impairment, with normal results following the administration of the bronchodilator. (R. 390.) A chest x-ray revealed no active lung disease. (R. 391.) Dr. Pulver determined that as to "residual function," Pickering had "no restrictions." (R. 390.)

### The ALJ's Decision

The ALJ found that there was no evidence that Pickering "engaged in substantial gainful activity since August 20, 1992." (R. 9.) The ALJ found that Pickering "has hypertension, asthma and a history of phlebitis [and diabetes] which impose restrictions on the claimant's ability to perform basic work-related functions." (R. 9, 10.) The ALJ determined, however, that "[t]he medical evidence does not establish the existence of an impairment which meets or equals in severity an impairment contained in ... Appendix 1, Subpart P, of [Social Security] Regulations No. 4." (R. 9.) Specifically, the ALJ found that Pickering's condition did not meet the requirements of Listings 3.03 (asthma), 4.03 (hypertensive cardiovascular disease), 4.11 (chronic venous mellitus) and 9.08 (diabetes mellitus). (R. 9.)

From a review of the medical records, the ALJ found that Pickering's hypertension and diabetes are controlled and do not cause any complications or restrictions. (R. 10.) As to Pickering's phlebitis, the ALJ found that while she had recurrent bouts of thrombophlebitis of the right leg that had required hospitalization, recent medical examinations had shown no significant abnormal findings. (R. 10.) The ALJ further noted that "despite the claimant's allegations that she suffers from pain with walking, treatment notes from New Rochelle Hospital and Medical Center, claimant's treatment source, fail to reflect this symptom in any of their records nor did she mention this to the consultative examiner." (R. 10.) As to Pickering's asthma, the ALJ determined that there was no evidence of actual lung disease but "pulmonary studies have revealed findings consistent with a mild restrictive impairment." (R. 10.) The ALJ further noted, however, that "treatment notes appear to indicate that when an [asthma] attack has occurred claimant had been noncompliant with medication." (R. 10.)

The ALJ concluded that "[s]ignificantly, treatment records, as well as the report from a consultative examiner, do not reveal any specific limitations or restrictions arising from the claimant's impairments." (R. 10.) The ALJ acknowledged that Pickering's "respiratory symptoms could be exacerbated by strenuous activity, thus precluding the claimant from lifting in excess of 20 pounds maximum on an occasional basis, and 10 pounds frequently. Respiratory symptoms would also be aggravated by exposure to major pulmonary irritants." (R. 11.) The ALJ then found that, although Pickering "is no longer able to perform her past relevant work" as a "grounds worker at an amusement park and as a worker in a fast food restaurant ... due to her need to avoid exposure to heat, humidity and fumes," she "retains the ability to perform light and sedentary work activities (20 CFR 416.967)," since there "are no indications her ability to sit, stand and walk has been compromised." (R. 11.)

The ALJ concluded:

The claimant is 36 years old, has a high school education, and has performed unskilled work. Considering her residual functional capacity for light work and her vocational profile, Vocational Rule 202.20, Table No. 2, Appendix 2, Subpart P, Regulations No. 4, applies and directs a conclusion of not disabled. Her additional restriction, the need to avoid major pulmonary irritants, would not significantly impact on her ability to do a full range of light work since most light jobs would not involve exposure to major pulmonary irritants. Accordingly, using the above cited rule as a framework for decisionmaking, the Administrative Law Judge finds that the claimant is 'not disabled,' within the meaning of the Social Security Act (20 CFR 416.920(f)).

(R. 11.)

## ANALYSIS

### I. THE APPLICABLE LAW

For Social Security SSI and disability insurance benefits ("SSD") purposes, a person is considered disabled when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months". 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see Perez v. Chater, 77 F.3d 41, 46 (2d Cir.1996); Massimino v. Shalala, 927 F.Supp. 139, 142 (S.D.N.Y.1996) (Batts, J.); DeJesus v. Chater, 899 F.Supp. 1171, 1173 n. 3 (S.D.N.Y.1995); Francese v. Shalala, 897 F.Supp. 766, 769 (S.D.N.Y.1995) (Batts, J.); Coleman v. Shalala, 895 F.Supp. 50, 53 (S.D.N.Y.1995) (Batts, J.). The combined effect of all impairments must be of such severity that the person

is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); *see* 42 U.S.C. § 423(d)(2)(B).

■ In determining whether an individual is disabled for SSI purposes, the Commissioner must consider: "(1) objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir.1983) (per curiam); *see also, e.g., Carroll v. Secretary of Health & Human Services*, 705 F.2d 638, 642 (2d Cir.1983); *Walzer v. Chater*, 93 Civ. 6240, 1995 WL 791963 at *6 (S.D.N.Y. Sept. 26, 1995) (Peck, M.J., *aff'd* by Kaplan, D.J.); *DeJesus v. Shalala*, 94 Civ. 0772, 1995 WL 812857 at *4 (S.D.N.Y. June 14, 1995) (Peck, M.J.), *aff'd*, 899 F.Supp. 1171 (S.D.N.Y.1995).

■ The Court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination. *E.g., Perez v. Chater*, 77 F.3d at 46; *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir.1991); *Mongeur v. Heckler*, 722 F.2d at 1037; *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir.1983); *Massimino v. Shalala*, 927 F.Supp. at 143; *Walzer v. Chater*, 1995 WL 791963 at *6; *Francese v. Shalala*, 897 F.Supp. at 770; *Coleman v. Shalala*, 895 F.Supp. at 54; 42 U.S.C. § 405(g).[1] The Supreme Court has defined "substantial evidence" as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *see also, e.g., Perez v. Chater*, 77 F.3d at 46; *Walzer v. Chater*, 1995 WL 791963 at *6.

■ The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987). The Second Circuit has articulated the five steps as follows:

■ First, the Secretary [now, Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. [2] If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. [5] Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982); *see also, e.g., Perez v. Chater*, 77 F.3d at 46; *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir.1995); *Massimino v. Shalala*, 927 F.Supp. at 143; *Walzer v. Chater*, 1995 WL 791963 at *6; *Francese v. Shalala*, 897 F.Supp. at 769; *Coleman v. Shalala*, 895 F.Supp. at 53–54. The claimant bears the burden of proof as to the first four of these steps considering not only her medical capacity but also her age, education and training. *Berry v. Schweiker*, 675 F.2d at 467. If the claimant meets the burden of proving that she cannot return to her past work, thus establishing a prima facie case, *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir.1980), the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only her medical capacity but also her age, edu-

---

1. Nevertheless, a reviewing court must also "remember that '[t]he Social Security Act is a remedial statute which must be "liberally applied"; its intent is inclusion rather than exclusion.'" *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983).

cation and training. *Berry v. Schweiker*, 675 F.2d at 467; *see also, e.g., Walzer v. Chater*, 1995 WL 791963 at *7.

## II. APPLICATION OF THE FIVE–STEP SEQUENCE TO PICKERING'S CLAIM

Here, although the Court will briefly review the first four steps, the parties' dispute centers on the fifth step. (*See* Pickering Reply Br. at 2.)

### 1. Pickering Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Pickering was engaged in substantial gainful activity after her SSI application on August 20, 1992. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510 (1993); *see also, e.g., Walzer v. Chater*, 1995 WL 791963 at *7. The ALJ's conclusion that Pickering was not engaged in substantial gainful activity during the applicable time period (R. 9, 11) is not challenged by the parties and is supported by substantial evidence.

### 2. Pickering Has A Severe Physical Impairment That Significantly Limits Her Ability To Do Basic Work Activities

The next step of the analysis is to determine whether Pickering has satisfied her burden by proving that she has a severe physical impairment that "significantly limit(s) [her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The "ability to do basic work activities" is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Basic work activities" include:

> ... walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling ... seeing, hearing, and speaking ... [u]nderstanding, carrying out, remembering simple instructions ... [u]se of judgment ... [r]esponding appropriately to supervision, co-workers and usual work situations.

20 C.F.R. § 404.1521(b)(1)–(5); *see also, e.g., Walzer v. Chater*, 1995 WL 791963 at *7.

The Second Circuit has warned that the step 2 analysis may do no more than "screen out de minimis claims." *Dixon v. Shalala*, 54 F.3d at 1030. If the disability claim rises above the de minimis level, then the further analysis of step 3 and beyond must be undertaken. *Id.*

The ALJ found that Pickering "has severe asthma, a history of phlebitis, hypertension and diabetes." (R. 11.) The ALJ concluded that these ailments, in particular her asthmatic condition, have led to Pickering being precluded from "lifting in excess of 20 pounds maximum on an occasional basis, and 10 pounds frequently." (R. 11.) This amounts to a step 2 finding that Pickering suffers from a severe physical impairment that significantly limits her ability to perform basic work activities. The finding is undisputed by the parties and supported by substantial evidence.

### 3. Pickering Does Not Have a Disability Listed in Appendix 1 of the Regulations

The third step of the five part test requires a determination of whether Pickering has an impairment listed in Appendix 1 of the regulations. " 'These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the "listed" impairments, he or she is conclusively presumed to be disabled and entitled to benefits.' " *Dixon v. Shalala*, 54 F.3d at 1022.

The ALJ found that Pickering's ailments did not meet or equal the severity of any of the listed impairments. Specifically, the ALJ found that Pickering's condition did not satisfy the requirements of the impairments contained in Listings 3.03 (asthma), 4.03 (hypertensive cardiovascular disease), 4.11 (chronic venous insufficiency) and 9.08 (diabetes mellitus). (R. 11.) This finding also is not disputed by the parties and is supported by substantial evidence.

### 4. *Pickering Lacks The Ability To Perform Her Past Work*

The fourth prong of the five part analysis requires a determination of whether Pickering had the residual functional capacity to perform her past work. Pickering's past relevant work "was as a grounds worker at an amusement park and as a worker in a fast food restaurant."[2] (R. 11.) The ALJ found that, although these jobs were described by Pickering as requiring "a light level of exertion," she is no longer able to perform them due to her respiratory condition which requires her "to avoid exposure to heat, humidity and fumes." (R. 11.) This finding also is not challenged by the parties and is supported by substantial evidence.

### 5. *Pickering Can Perform Other Work In The Economy*

■ In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy, and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training." *E.g., Parker v. Harris,* 626 F.2d at 231; *DeJesus v. Shalala,* 1995 WL 812857 at *6–7.

In meeting her burden under the fifth step, the Commissioner ordinarily will make use of the "Grid":

> In meeting her burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

*Zorilla v. Chater,* 915 F.Supp. 662, 667 (S.D.N.Y.1996); *see also, e.g., Heckler v. Campbell,* 461 U.S. 458, 461–62, 465–68, 103 S.Ct. 1952, 1954–55, 1956–58, 76 L.Ed.2d 66 (1983) (upholding the promulgation of the Grid); *Perez v. Chater,* 77 F.3d at 46; *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986). "The Grid classifies work into five categories based on the exertional requirements of the different jobs. Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." *Zorilla v. Chater,* 915 F.Supp. at 667 n. 2; *see also, e.g., Perez v. Chater,* 77 F.3d at 46; 20 C.F.R. § 404.1567(a). Taking account of the claimant's residual functional capacity, age, education and prior work experience, the Grid yields a decision of "disabled" or "not disabled." 20 C.F.R. § 404.1569, 404, Subpt. P, App. 2, 200.00(a).

The ALJ used the Grid "as a framework for decisionmaking" as to Pickering's situation. (R. 11.) The ALJ found that Pickering "is 36 years old, has a high school education, and has performed unskilled work." (R. 11.) "Considering [Pickering's] residual functional capacity for light work,"[3] the ALJ concluded that "Vocational Rule 202.20, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 . . . applies and directs a conclusion of not disabled." (R. 11.)

---

2. The ALJ's decision did not refer to her temporary job as a postal worker, but since that job entailed almost constant standing, as well as occasional heaving lifting (R. 24–25), the ALJ implicitly found that she could not perform that work. (R. 11.) Neither party claims that Pickering is able to perform her past postal work.

3. "Light work involves a good deal of walking or standing, or, when it involves sitting most of the time, some pushing and pulling of arm or leg controls. It involves 'lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.' To be considered capable of performing a full or wide range of light work, a claimant . . . 'must have the ability to do substantially all of these activities.' [20 C.F.R.] § 416.967(b); *see also* 20 C.F.R. § 404.1567(b)." *Vargas v. Sullivan,* 898 F.2d 293, 294 (2d Cir.1990). The parties agree that Pickering's work as a fast food worker is a job defined as "light work." (*See* Pickering Br. at 6, Commissioner's Br. at 17 n. 6.)

The Grid is directed to exertional limitations affecting the claimant's ability to meet the strength demands of jobs; it does not take into account non-exertional limitations that a claimant may have.[4] Thus, a two-stage approach to use of the Grid is necessary. As the Court previously has explained:

> Where an individual has both exertional and nonexertional limitations of function, the Secretary [now, the Commissioner] first determines whether a finding of "Disabled" may be possible based on the claimant's strength limitations alone. See 83–14, PPS–105, "Capability to Do Other Work: The Medical–Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments." Where a person's RFC [residual function capacity], age, education, and work experience coincide with the criteria of an exertionally based rule in Table Number One, Two, or Three—and that rule directs a conclusion of "Disabled"— there is no need to consider the additional effects of a nonexertional impairment, since consideration of it would add nothing to the fact of disability. *See id.* However, if the rules do not direct a conclusion of "Disabled," then the Secretary looks to them as "provid[ing] a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs [within the exertional ranges] that would be contraindicated by the non-exertional limitations." *Id.* (quoting 20 C.F.R. § 404, Subpt. P, App. 2, § 200.00(e)(2)).

*Carter v. Shalala,* 94 Civ. 4064, 1995 WL 505509 at *10 (S.D.N.Y. Aug. 24, 1995); *see also, e.g., Bapp v. Bowen,* 802 F.2d at 605 ("in a case where both exertional and nonexertional limitations are present, the [Grid] guidelines cannot provide the exclusive framework for making a disability determination.").

The propriety of relying on the Grid in a case like this depends on whether the non-exertional limitation significantly limits the claimant's work capacity. As the Second Circuit has held:

> [W]e hold that application of the grid guidelines ... must be determined on a case-by-case basis. If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate. But if a claimant's nonexertional impairments "significantly limit the range of work permitted by his exertional limitations" then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments.... Accordingly, where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grid is inappropriate. By the use of the phrase "significantly diminish" we mean the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.

*Bapp v. Bowen,* 802 F.2d at 605–06. " '[I]f a non-strength impairment, even though considered significant, has the effect only of reducing that occupational base marginally, the Grid remains highly relevant and can be relied on exclusively to yield a finding as to disability.' " *Crean v. Sullivan,* 91 Civ. 7038, 1992 WL 183421 at *5 (S.D.N.Y. July 22, 1992).

The Court therefore must now determine whether Pickering's nonexertional limitations significantly diminished the range of employment that was available to her within the "light work" category so as to make the Grid inapplicable. As discussed above, the ALJ found that Pickering's hypertension and diabetes were controlled and did not cause any complications or restrictions. (R. 10.) The

**4.** "An 'exertional limitation' is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (*i.e.*, sitting, standing, walking, lifting, carrying, pushing, and pulling). 20 C.F.R. § 404.1569a(b). A 'nonexertional limitation' is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. § 404.1569a(c). Examples of nonexertional limitations are nervousness, difficulties with sight or vision, and an inability to tolerate dust or fumes. 20 C.F.R. § 404.1569a(c)(i), (iv), (v)." *Zorilla v. Chater,* 915 F.Supp. at 667.

ALJ also found that Pickering's allegation of leg pain from her phlebitis was not supported by the medical records and thus that there were no restrictions on her ability to sit, stand or walk as a result of her phlebitis. (R. 10, 11.) Pickering does not challenge any of these findings. (*See generally* Pickering Br. & Reply Br.) Pickering's focus here is on the restrictions caused by her asthma. On this issue, the ALJ found that Pickering's "additional restriction, the need to avoid major pulmonary irritants, would not significantly impact on her ability to do a full range of light work since most light jobs would not involve exposure to major pulmonary irritants." (R. 11.)

Social Security Ruling 83–14 sheds some light on whether this environmental restriction caused by asthma is to be considered significant. As an example of a nonexertional limitation that impacts on the size of the remaining occupational base within the light work category to such an extent as to deprive the claimant of a meaningful employment opportunity, the Ruling lists "a visual impairment which is not of Listing severity but causes the person to be a hazard to self and others." SSR 83–14, PPS–105, "Capability to Do Other Work: The Medical–Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments" [hereafter, "SSR 83–14"], at 206. The Ruling notes that, in contrast, "environmental restrictions, such as the need to avoid exposure to feathers" are nonexertional restrictions that would "not significantly effect the potential unskilled light occupational base." *Id.* at 207.

■ Social Security Regulation 83–14 further provides that "[w]here nonexertional limitations or restrictions within the light work category are between the examples above, a decision maker will often require the assistance of a VS [vocational specialist]."

*Id.* On the other hand, "[t]he services of a vocational specialist are *necessary* only 'where the adjudicator does not have a clear understanding of the effects of additional limitations on the job base'." *Carter v. Shalala,* 1995 WL 505509 at *11 (emphasis added).

In *Carter v. Shalala,* the Court upheld the Commissioner's determination that the claimant was not disabled. Although no vocational specialist had evaluated claimant's condition, the Court held that the Commissioner's decision that plaintiff's asthmatic condition did not significantly diminish her capacity to perform the full range of sedentary work was still supported by substantial evidence. 1995 WL 505509 at *11. Much like the instant case, the claimant there alleged a nonexertional limitation due to asthma that she claimed removed her case from Grid applicability. The *Carter* Court pointed to the following evidence as supporting the finding of no disability: claimant's asthma was controlled with medication; claimant was only hospitalized or seen in the emergency room on two occasions for asthma attacks at which time her lungs were found clear on examination; and there was no medical testimony that the asthma reduced her ability to perform basic work activities. *Id.* at *10.[5]

■ Similarly, in the present case the ALJ's finding that Pickering's asthmatic condition did not significantly diminish her capacity to perform the full range of jobs within the light work category is supported by substantial evidence, even without the testimony of a vocational specialist. The record shows that Pickering received treatment for asthma at the HIP Center once a month (R. 31) and has had a steroid inhaler prescribed. (R. 345.) However, the record reveals only a few (R. 389) hospital visits for asthma, possibly due to the success of her treatment. On

---

**5.** *Accord, e.g., Tirado v. Bowen,* 842 F.2d 595, 597 (2d Cir.1988) ("we conclude that this case did not call for the use of a vocational expert because there was substantial evidence before the ALJ to support the view that claimant's non-exertional impairments [including claimant's asthmatic condition] did not 'significantly diminish' her work capacity beyond the restriction caused by her exertional impairments."); *Vargas v. Bowen,* 712 F.Supp. 331, 332, 333–34 (S.D.N.Y.1989)

(ALJ's decision that the claimant's capacity to perform the full range of light work was not significantly diminished by the environmental restrictions relating to her asthma—including the necessity to avoid "exposure to dust, fumes, gases, and marked changes in temperature"—held to be supported by substantial evidence despite the lack of vocational specialist testimony), *rev'd on other grounds sub nom., Vargas v. Sullivan,* 898 F.2d 293 (2d Cir.1990).

**428**

examination, Pickering exhibited no wheezes, rales, or rhonchi. (R. 213, 389.) Her repeat pulmonary functions were normal after bronchodilation. (R. 214, 390.) Significantly, the report from Dr. Pulver, a consultative examiner, expressly found that Pickering was under "no restrictions." (R. 390.) The record contains no medical evidence that contradicts this finding.[6]

Pickering's main complaint in this action is that, in her view, the ALJ's determination is "internally inconsistent." (Pickering Br. at 6.) Pickering claims that "[t]he ALJ's finding that plaintiff could not perform her past relevant light work, as a fast food worker, must lead to the determination that plaintiff lacks the functional capacity to perform a full range of light work." (Pickering Br. at 6; see also Pickering Reply Br. at 3.) Pickering claims that the necessity to avoid exposure to pulmonary irritants such as heat, humidity and fumes, unlike the avoidance of feathers, constitutes more than a negligible loss of work capacity such that the testimony of a vocational expert was necessary. (Pickering Reply Br. at 3–5.) As discussed above, the Court disagrees. The Social Security Ruling refers to avoidance of "environmental restrictions" and gives feathers as an example. SSR 83–14, at 207. The Court considers heat, humidity and fume avoidance to be a similar "environmental restriction" so as to fall within that Ruling. Thus, the ALJ's finding is not inconsistent, the environmental restriction was not substantial, and it was not necessary for the ALJ to have obtained a vocational expert's testimony.

The Court emphasizes that the ALJ could have eliminated any issue on this appeal had he called a vocational specialist to testify. That clearly would have been the preferable course. The Court, however, does not find it to have been required in this case. Substantial evidence supports the ALJ's determination that Pickering's non-exertional limitation caused by her asthma did not significantly diminish the range of employment available to her within the Grid's light work category.

Thus, the ALJ's conclusion that Pickering is not disabled under the Social Security Act was supported by substantial evidence.

### CONCLUSION

For the reasons set forth above, I recommend that the Court grant the Commissioner's motion for judgment on the pleadings and deny plaintiff Pickering's cross-motion.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. See also Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts, 500 Pearl Street, Room 2510, and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Batts. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); IUE AFL–CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir.1993), cert. denied, 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); Small v. Secretary of Health & Human Services, 892 F.2d 15, 16 (2d Cir.1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57–59 (2d Cir.1988); McCarthy v. Manson, 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Dated: New York, New York
    September 26, 1996.

---

**6.** The medical record also demonstrates that despite Pickering's asthma, she admitted to smoking a third of a pack of cigarettes per day in 1991. (R. 213.) "Of course, a remedial impairment is not disabling." Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir.1983) (no disability where claimant's cardiac condition under control "and his only remaining difficulty of consequence is a breathing problem that is being aggravated and probably caused by [claimant's] smoking.").