Aroldi ROMAN, Plaintiff,

v.

Kenneth S. APFEL,[1] Commissioner of Social Security, Defendant.

No. 3:97CV1148(AHN).

United States District Court, D. Connecticut.

Sept. 9, 1998.

1. On September 29, 1997, Kenneth S. Apfel was sworn in as Commissioner of Social Security. Pursuant to Rule 25(d)(1), Fed.R.Civ.P., he is automatically substituted as the defendant in this action.

Meryl Anne Spat, Waterbury, CT, for Plaintiff.

Deirdre Anne Martini, U.S. Attorney's Office, Bridgeport, CT, for Defendant.

## RECOMMENDED RULING ON PENDING MOTIONS

FITZSIMMONS, U.S. Magistrate Judge.

Plaintiff, Aroldi Roman, filed this action seeking review, pursuant to 42 U.S.C. § 405(g), of the decision of the Commissioner denying his claim for Supplemental Security Income ("SSI") benefits under the Social Security Act. Plaintiff filed a motion for summary judgment and defendant moved for an order affirming the decision of the Commissioner. Upon consideration of the motions filed by plaintiff and defendant, the court recommends that plaintiff's motion be denied and defendant's motion be granted.

## BACKGROUND

Plaintiff was born on January 17, 1962, in Puerto Rico. (*See* R. 41, 32.)[2] He had lived in Connecticut for ten years at the time of the hearing before the Administrative Law Judge ("ALJ"). (*See* R. 32.) He attended school in Puerto Rico through the fifth grade[3] and has a minimal ability to read and write in Spanish. (*See* R. 33.) He cannot speak English and understands only a few words. (*See Id.*) Plaintiff was self-employed as a fisherman in Puerto Rico. He has no work history in the United States. (*See* R. 31.) Plaintiff claims that he became disabled on January 1, 1984, as a result of bronchial asthma and testicular surgery. (*See* R. 41, 64.)

Plaintiff filed an application for SSI benefits on March 24, 1994. (*See* R. 41–43.) The application was denied on September 9, 1994. (*See* R. 47–50.) In response to plaintiff's request for reconsideration filed on October 12, 1994, (*see* R. 51–52), the agency, on November 17, 1994, issued a notice of reconsideration upholding the denial of benefits. (*See* R. 54–57.) Plaintiff untimely requested a hearing before an ALJ on February 22, 1995. (*See* R. 58–63.) Plaintiff was found to have had good cause for the late filing. (*See* R. 18, 60.)

The hearing before the ALJ was held on November 30, 1995. (*See* R. 28–40.) Plaintiff appeared with counsel at the hearing and testified through an interpreter. (*See* R. 30.) Plaintiff stated that he cannot work because he is unable to sit or stand for more than one hour and cannot walk "a lot" because of his asthma. (R. 35.) He also experiences "a very strong pain in [his] testicles." (*Id.*) This pain began after testicular surgery in 1984, and has become worse in the last three years. Plaintiff described the pain as constant and so severe that he must stay in bed and sometimes cries when he urinates. (*See Id.*) He takes prescription pain medication. (*See* R. 34.) Plaintiff characterized pain as his worst problem and stated that he had

2. The administrative record filed by the Commissioner shall be referred to as "R.".

3. Plaintiff indicated in the disability report completed at the time of his initial application for benefits and in a report prepared for the city welfare department that he had completed the seventh grade. (R. 68, 104.) The administrative law judge found, however, that plaintiff possessed a fifth grade education. (R. 19.)

been referred to a neurologist.[4] (*See* R. 36.) Plaintiff stated that even if the pain were corrected he would not be able to work because his asthma causes him to spend his time lying down. He indicated that his asthma is not as bad as it once was, but that he is constantly short of breath. When he experiences an asthma attack, he goes to the hospital where he is treated on a machine. (*See Id.*) Plaintiff stated that he has no other medical problems. (*See* R. 37.)

Plaintiff is not married and lived with his aunt at the time of the hearing. (*See* R. 33.) He receives city welfare payments. (*See Id.*) He spends his days in the house watching television or listening to music. (*See Id.*) He does not drive and relies on his neighbor for rides. (*See* R. 34.) Plaintiff stated that he felt depressed because he cannot do anything and cannot have children. (*See* R. 38.) Although he stated that he told his doctor that "bad thoughts" come into his mind, he could not provide an example to the ALJ. (*See Id.*) In response to a question by the ALJ, plaintiff stated that he has become angry and felt like hurting himself or others. (*See Id.*)

The ALJ had before him medical evidence for the period from September 25, 1987 through October 13, 1994. A summary of the medical evidence follows.[5]

On September 25, 1987, plaintiff reported to the Emergency Room at St. Mary's Hospital in Waterbury, Connecticut, complaining of pain in the inguinal area.[6] (*See* R. 93.) Plaintiff stated that he underwent surgery in 1984, and had a history of kidney problems, urinary tract infections and gonorrhea. He was taking no medication. (*See Id.*) Plaintiff was referred to a urologist for evaluation. (*See* R. 94.) On December 29, 1987, plaintiff again reported to the Emergency Room complaining that he had experienced dysuria[7]

and urethral discharge for three days. (*See* R. 91.) On September 13, 1993, plaintiff again complained of pain in his lower abdomen and genital region, specifically, painful urination and painful intercourse. He was taking over-the-counter Motrin for the pain. (*See* R. 90.) Plaintiff sought a doctor's statement that he was unable to work so that he would be eligible for welfare benefits. (*See Id.*) The record does not indicate whether he was provided the statement. Plaintiff was diagnosed as suffering from prostatitis or a urinary tract infection and given a prescription. Because plaintiff experienced these symptoms chronically, his complaints were not considered an acute manifestation. (*See* R. 88.)

On September 9, 1988, plaintiff received prescriptions for acute bronchitis. (*See* R. 92.) On September 13, 1993, plaintiff denied any history of asthma, but stated that he had gone to the Emergency Room the previous day because he had experienced difficulty breathing. Plaintiff had been given an inhaler and felt better. (*See* R. 90.)

On January 10, 1994, plaintiff reported to the Emergency Room complaining of shortness of breath. He was in no respiratory distress and was given a refill for his inhaler. (*See* R. 95.) On January 30, 1994, plaintiff returned to the Emergency Room for another refill. Plaintiff displayed no dyspnea[8] or wheezing. (*See* R. 96.) On February 18, 1994, plaintiff received another inhaler prescription. (*See* R. 97.) On March 11, 1994, plaintiff reported to the Emergency Room complaining of a sore throat, fever and painful urination. A throat culture and urinalysis were ordered. (*See* R. 98–100.)

On March 21, 1994, plaintiff's treating physician provided a medical report to the city

---

**4.** There are no medical records indicating that plaintiff was seen by or referred to a neurologist. The court assumes that plaintiff meant his consultation with a urologist referenced in the treating physician's October 1996 report.

**5.** Plaintiff stated in the Disability Report filed at the time of his initial application for SSI benefits that he underwent testicular surgery in 1984 at the Caguas Regional Hospital in Puerto Rico and was hospitalized from May through August 1984. (*See* R. 66.) Plaintiff also stated that he underwent a second surgical procedure in March

1994. (*See* R. 65.) No medical records for either surgical procedure were provided.

**6.** Relating to the groin. Stedman's Medical Dictionary 872 (26th ed.1995).

**7.** Difficulty or pain relating to urination. Stedman's Medical Dictionary 537.

**8.** Shortness of breath. Stedman's Medical Dictionary 535.

welfare department. (*See* R. 101–08.) The treating physician diagnosed plaintiff as suffering from an undescended testicle, bronchial asthma and a urinary tract infection. (*See* R. 102.) Plaintiff's current treatment included inhalers and medication for asthma. The treating physician noted that although plaintiff would suffer from asthma for life, the prescribed treatment would improve his work capacity. (*See* R. 106.) The treating physician stated that plaintiff has significant restrictions on his ability to reach with his arms and legs but could walk 500 feet, stand for four hours, sit for four hours, occasionally bend or stoop and frequently lift twenty pounds. (*See Id.*) In addition, the treating physician found no limitation on any mental activities associated with work such the ability to remember and carry out directions, maintain attention and concentration, make decisions and interact appropriately with others. (*See* R. 105.)

In a client supplement attached to the treating physician's report, plaintiff stated that his illness made him stop working in March 1994. (*See* R. 104.) He cannot bend, walk, stand, lift, sit, reach or use his hands. He is unable to cook, do dishes or laundry, vacuum, dust or make the bed. (*See* R. 103.)

On March 28, 1994 and May 14, 1994, plaintiff reported to the Emergency Room to obtain refills for his inhaler. (*See* R. 109, 111.) In May, the plaintiff's lungs were clear and he was not wheezing. (*See* R. 111.)

On August 31, 1994, plaintiff underwent a consultative examination. Plaintiff told the consultative physician that his chief complaint was pain in the lower abdomen which was accentuated by attempting to perform physical exertion, especially lifting. (*See* R. 113.) The consultative physician noted that upon examination plaintiff's lungs showed no rales[9] or rhonchi[10] during quiet or forced breathing. Although plaintiff resisted examination of his abdomen and complained of tenderness, the consultative physician could not determine whether plaintiff actually experienced pain or just found the examination unpleasant. The consultative physician opined that neurologically plaintiff was not making a full effort. Straight leg raising produced lower abdominal pain at 30°. (*See* R. 115.) The consultative physician's impression was:

1. Status post surgery for bilateral undescended testes with experiencing of lower abdominal, inguinal, scrotal and bilateral leg pain since surgery which is atypical of this particular surgical procedure.

2. Burning on urination which could indicate a urinary infection even upper urinary tract infection which might possibly account some of the symptoms.

3. Asthma, well controlled at the present time.

(*Id.*)

On September 8, 1994, plaintiff reported to the Emergency Room because he had run out of inhaler. His lungs were clear and he exhibited no wheezing. (*See* R. 117.) On September 11, 1994, he went to the Emergency Room in no apparent respiratory distress because he had lost his inhaler. (*See* R. 118–19.) Later that night, plaintiff returned to the Emergency Room complaining that his asthma prevented him from sleeping. He exhibited signs of acute asthma and was given two treatments, after which plaintiff's wheezing stopped. (*See* R. 120.)

On September 16, 1994, the consultative physician filed a second report. He indicated that plaintiff complained of pain and acted as if he felt marked tenderness during the physician's examination of his testes. The consultative physician, was unsure, however, "that his complaint of tenderness was bonafide [sic]." (R. 122.) On October 13, 1994, plaintiff again reported to the Emergency Room because he wanted a prescription for an inhaler. (*See* R. 124.)

In addition to the medical evidence, the ALJ had questionnaires completed by plaintiff. On April 13, 1994, plaintiff completed a

---

**9.** An ambiguous term used to refer to an additional sound heard when listening to breath sounds. Stedman's Medical Dictionary 1488, 169.

**10.** An additional sound with a musical pitch caused by air passing through bronchi that are narrowed by inflammation which is heard when listening to breath sounds. Stedman's Medical Dictionary 1547.

pain questionnaire. (*See* R. 125–26.) Plaintiff stated that the constant pain in his testicles, legs and waist was unchanged since it began in 1984. (*See* R. 125.) He had been taking medication for the pain for two months but experienced no relief. (*See* R. 125–26.) He used no other devices, programs or treatments for the pain and did not require a cane to walk. (*See* R. 126.)

Plaintiff also completed an undated activities questionnaire. (*See* R. 127–30.) He stated that during the day he watched television, listened to music and did easy chores. Walking took most of his time because he experienced shortness of breath and fatigue. He could not lift heavy objects or bend down. He had difficulty preparing meals because he was unable to stand too long. He could, however, heat meals that were previously prepared and help with shopping. (*See* R. 127.) At the time he completed the questionnaire, plaintiff lived with his cousin who did all of the chores. Plaintiff was able to care for his personal needs. He had no hobbies and engaged in no activities. (*See* R. 128.) Plaintiff stated that he visited friends for about one-half hour every two weeks, when he could get a ride. (*See* R. 129.)

At the time of his initial application for SSI benefits, the interviewed noted that plaintiff was rude until the interview was conducted in Spanish. Then plaintiff became friendly. (*See* R. 71.) The interviewer stated: "Mr. Roman was moaning at my desk. He lowered his head a lot and grabbed his pants. He said he was in constant pain since the operation in 1984. We [sic] walked with a strange gait." (*Id.*) When plaintiff was interviewed after requesting reconsideration of the denial of benefits, the interviewer stated: "Groaned when shifted in the seat. Did not have any breathing difficulties while visiting the office. No raspiness sounds when inhaled, etc." (R. 76.) Plaintiff reported in connection with his request for reconsideration that his groin pain is relieved by walking. (*See* R. 72.)

A residual functional capacity assessment performed for the agency in November 1994, indicated that plaintiff had no exertional limitations. (*See* R. 80.) The only environmental limitation noted was that plaintiff should avoid concentrated exposure to fumes, odors, dust, gasses and poor ventilation. (*See* R. 83.)

At the conclusion of the hearing, the ALJ agreed to refer plaintiff to a Spanish-speaking psychiatrist for a consultative examination and left the record open to receive the consultative report and to enable plaintiff to respond to the consultative report and file a list of his medications. (*See* R. 38–39. 143–44.) No list of medications was filed after the hearing.

The consultative psychiatric examination was conducted on June 13, 1996. The consultative psychiatrist reported that although plaintiff behaved appropriately with the people who drove him to the examination when observed surreptitiously, he was uncooperative during the interview. (*See* R. 146.) Plaintiff stated that he did not know what country, city or state he lived in and could not remember who raised him. He identified the date as September 14, 1997. (*See Id.*) Before the formal interview with the consultative psychiatrist began, however, plaintiff stated that he had come from Waterbury and that it was a long ride to New Haven, where the examination was held. Plaintiff was dressed appropriately for the summer weather. (*See* R. 147.) Although plaintiff denied the ability to remember anything, he knew what he had for breakfast that day and for dinner the day before. (*See Id.*)

The consultative psychiatrist noted that plaintiff did not appear psychotic and did not seem to be responding to internal stimuli. Rather he was acting provocatively, saying that he had so much pain that he was going to kill himself or someone else. Plaintiff exhibited fair impulse control. (*See Id.*) The consultative psychiatrist's impression was that plaintiff was malingering. He was uncooperative during the interview and his complaints of memory loss appeared feigned. The consultative psychiatrist found no acute problems and opined that plaintiff was psychiatrically capable of handling his own affairs. (*See Id.*) The consultative psychiatrist stated in his report that he had performed a mental status examination because plaintiff had been referred for unclear reasons. (*See* R. 146.) Based upon this statement, plaintiff

requested that a second consultative psychiatric examination be performed for a psychiatric diagnosis and intelligence testing. (*See* R. 145.) The ALJ noted that the consultative psychiatrist knew that plaintiff required a psychological examination and found no evidence of psychosis. (*See* R. 19–20.) The ALJ determined that plaintiff's "failure to cooperate during an interview conducted in his native language is not suggestive of any administrative error or misunderstanding on the examiner's part that would be 'corrected' by the scheduling of another examination" and did not accept plaintiff's objection. (R. 20.)

On October 24, 1996, the ALJ denied plaintiff's application for SSI benefits. (*See* R. 15–24.) On December 5, 1996, plaintiff filed a request for review by the Appeals Council. (*See* R. 10–14.) The plaintiff submitted additional medical exhibits to the Appeals Council. In October 1996, plaintiff's treating physician stated that plaintiff suffered from asthmatic bronchitis and either a urological problem or prostatitis. Although plaintiff previously had been examined by a urologist, the treating physician was unaware of the urologist's diagnosis. (*See* R. 149.) The treating physician assessed plaintiff's residual functional capacity as able to occasionally lift and carry ten pounds, frequently lift and carry ten pounds and occasionally, i.e., for up to 2.5 hours, stand or walk, push or pull, reach, handle, finger, feel, climb, balance, stoop, kneel, crouch and crawl depending on his asthmatic symptoms. (*See* R. 151.) The treating physician opined that plaintiff had unlimited abilities concerning mental activities associated with employment. (*See* R. 152.) If plaintiff avoided dusty working conditions, the treating physician thought that plaintiff's condition would improve. (*See Id.*) Plaintiff's attorney also asked the Appeals Council to order a second psychiatric examination. On May 14, 1997, the Appeals Council ordered that the treating physician's report be made part of the administrative record. (*See* R. 6.) On May 16, 1997, the Appeals Council denied the request for review. (*See* R. 4–5.) Plaintiff then timely filed this appeal within the sixty day period following receipt of the decision of the Appeals Council.

## STANDARD OF REVIEW

 The scope of review of a social security disability determination involves two levels of inquiry. The court must first decide whether the Commissioner applied the correct legal principles in making the determination. Next, the court must decide whether the determination is supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Rodriguez v. Califano*, 431 F.Supp. 421, 423 (S.D.N.Y.1977). The court may not decide facts, reweigh evidence or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir.1993); *Reyes v. Harris*, 486 F.Supp. 1063, 1067 (S.D.N.Y.1980). The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. Furthermore, "[w]hen there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson v. Bowen*, 817 F.2d at 986.

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). "Disability" is defined under both programs as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process. *See* 20 C.F.R. § 416.920. First, the court must de-

termine whether the claimant is currently working. *See* 20 C.F.R. § 416.910(b), 416.972(b). If the claimant is currently employed, the claim is disallowed. *See* 20 C.F.R. § 416.920(b). If the claimant is not working, as a second step, the agency must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is denied. *See* 20 C.F.R. § 416.920(c). Once the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in appendix 1 of the regulations [the "Listings"]. *See* 20 C.F.R. § 416.920(d); *Bowen v. Yuckert,* 482 U.S. 137, 141, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 416.920(d); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982). If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 416.920(e). If the claimant cannot perform his former work, he must show, as a fifth and final step, that he is prevented from doing any other work. A claimant is entitled to receive disability benefits only if he cannot perform any alternate gainful employment. *See* 20 C.F.R. § 416.920(f).

The initial burden of establishing disability is on the claimant. *See* 42 U.S.C. § 423(d)(5). Once the claimant demonstrates that he is incapable of performing his past work, however, the burden shifts to the Commissioner to show that the claimant has the residual functional capacity to perform other substantial gainful activity in the national economy. *See Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). This may require the application of the Medical–Vocational Guidelines ["the grid"] which places claimants with severe exertional impairments who can no longer perform past work into grid categories according to their residual functional capacity, age, education and work experience, and dictates a conclusion of disabled or not disabled. *See* 20 C.F.R. § 404.1520(f). A proper application of the grid makes vocational testing unnecessary.

The grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders are not covered. *See* 20 C.F.R. § 200.00(e)(2). If the grid cannot be used, *i.e.,* when nonexertional impairments are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is generally required to support a finding of residual functional capacity for substantial gainful activity. *See Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir.1986).

## DISCUSSION

Following the five step evaluation process, the ALJ determined that plaintiff has not engaged in substantial gainful activity since January 1, 1984. (*See* R. 22.) Although plaintiff presented medical evidence that he suffers from asthma, the ALJ found that his impairment does not meet or equal any listed impairment. (*See Id.*) The ALJ found plaintiff's statements concerning his impairment and his ability to work not entirely credible. (*See Id.*) The ALJ determined that plaintiff was unable to perform his past relevant work as a fisherman. (*See Id.*) The ALJ determined that plaintiff lacked the residual functional capacity to lift and carry more than twenty pounds or to walk for prolonged periods. (*See Id.*) Finding that plaintiff had no significant nonexertional limitations which would narrow the range of work he was capable of performing, the ALJ applied the grid and concluded that plaintiff was not disabled. (*See Id.*)

Plaintiff advances two arguments in support of his motion for summary judgment: (1) a remand is necessary to obtain a proper evaluation of the evidence of mental illness attached to the motion, and (2) the record contains substantial evidence supporting plaintiff's claim of chronic pain. In response, defendant argues that the new evidence does not warrant a remand and that plaintiff failed to present medical evidence in support of his claims. Defendant also contends that the decision of the Commissioner is supported by substantial evidence and should be affirmed. The court considers these arguments below.

## I. *Evidence of Mental Illness*

Plaintiff asks the court to remand this case to enable the Commissioner to consider evidence of mental illness.

A district court may remand a final decision of the Secretary pursuant to two sentences in § 405(g). Plaintiff does not specify under which sentence he is making his motion for remand.

■ Under sentence four of § 405(g) the district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause of action for a rehearing." The district court may remand a case pursuant to sentence four of § 405(g) for the taking of additional evidence, as long as the court enters a judgment affirming, modifying or reversing the Secretary's decision. *See Sullivan v. Hudson,* 490 U.S. 877, 880, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989).

■ Sentence six of § 405(g) states:

[t]he court may, on motion of the [Commissioner] made for good cause shown before he files his answer, remand the case to the [Commissioner] for further action by the [Commissioner], and it may at any time order additional evidence to be taken before the [Commissioner], but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding....

Under sentence six, the case is remanded without an order affirming or reversing the decision of the Commissioner. In addition, the party seeking a remand under sentence six to present additional evidence must demonstrate that the evidence is new and material, and that there is good cause why the evidence was not available earlier. *Melkonyan v. Sullivan,* 501 U.S. 89, 100, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).

In his motion for remand, plaintiff fails to indicate whether he requests a remand pursuant to sentence four or sentence six of § 405(g). The fact that plaintiff contemporaneously filed a motion for summary judgment suggests that he seeks a remand pursuant to sentence four. Plaintiff argues, however, that the new evidence is material and that he can demonstrate good cause for failing to produce the evidence earlier. This language suggest that plaintiff is requesting a remand pursuant to sentence six. Because plaintiff does not indicate which type of remand he seeks, the court considers the motion under both sentences of § 405(g).

The court first examines plaintiff's motion under sentence six and considers whether plaintiff has demonstrated the existence of new and material evidence.

■ The Second Circuit applies a three-part test to determine whether a remand for new evidence should be ordered:

The [party seeking the remand] must show that the proffered evidence is (1) "new" and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative. The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently. Finally, claimant must show (3) good cause for [his] failure to present the evidence earlier.

*Jones v. Sullivan,* 949 F.2d 57, 60 (2d Cir. 1991) (citations omitted) (citing *Tirado v. Bowen,* 842 F.2d 595, 597 (2d Cir.1988)).

The record before the ALJ contained no evidence of mental impairment other than the psychiatric evaluation ordered by the ALJ. The progress notes and psychiatric evaluation by plaintiff's treating psychiatrist sought to be added to the record, therefore, are new evidence. Thus, plaintiff satisfies the first part of the test.

■ The second part of the test is whether the new evidence is material and probative. The court need not address this element, however, because plaintiff fails to satisfy the third part of the test, namely that there exists good cause for failing to present this evidence earlier.

"To show good cause, [the claimant] must adequately explain [his] failure to incorporate the proffered evidence into the administra-

tive record." *Lisa v. Secretary of HHS*, 940 F.2d 40, 45 (2d Cir.1991) (citations omitted). Claimants "should not be encouraged to withhold material information from the Appeals Council in the hope that a federal district court might issue a more favorable result when the new evidence is presented to it." *Turner v. Sullivan*, 1992 WL 415379, at *3 (D.Minn. Sept.28, 1992). Other courts have held that the failure to present evidence to the Appeals Council negates a finding of good cause for failure to present new evidence earlier. *See Waite v. Bowen*, 819 F.2d 1356, 1361 (7th Cir.1987) (holding that good cause for failure to submit evidence earlier not shown where evidence available before Appeals Council had reviewed case and no indication that claimant insufficiently informed about proper procedure to submit supplemental pleading); *Kindred v. Heckler*, 595 F.Supp. 563, 567 (N.D.Ill.1984) (holding that claimant must show good cause for failure to submit evidence to ALJ and Appeals Council). Furthermore, by requiring the Appeals Council to consider new evidence regarding conditions existing prior to the hearing before the ALJ, the regulations support a determination that the claimant must show good cause for failure to present the new evidence to both the ALJ and the Appeals Council. *See* 20 C.F.R. § 404.970(b).

The progress notes cover the period from January through August 1997. The psychiatric evaluation was conducted on January 8, 1997. The Appeals Council did not issue its decision until May 16, 1997. In fact, in the May 1997 decision, the Appeals Council vacated a February 14, 1997 denial because plaintiff had submitted additional medical evidence to the Appeals Council. Plaintiff does not indicate why he did not present the psychiatric evaluation to the Appeals Council for consideration.

Accordingly, the court cannot find good cause for plaintiff's failure to present this evidence earlier. To the extent that plaintiff's motion may be construed as a request for remand pursuant to sentence six, the request should be denied. The court determines whether the case should be remanded pursuant to sentence four in connection with

its consideration of plaintiff's other ground for summary judgment.

## II. *Chronic Pain*

Plaintiff contends that remand is required for "more thoughtful consideration of [the plaintiff's] complaints of pain." (*See* Pl.'s Mem. Supp. Summ. J. at 7.) Plaintiff argues that he demonstrated pain behavior during his visits to the agency and that his treating physician credited his complaints of pain. Defendant contends that the ALJ made a proper credibility determination and was not required to fully credit plaintiff's complaints of pain. In addition, defendant notes that plaintiff's treating physician determined that plaintiff's ability to engage in employment at the sedentary level of exertion was limited only by his asthma.

The function of the Commissioner includes evaluating the credibility of all witnesses, including plaintiff. *See Carroll v. Secretary of HHS*, 705 F.2d 638, 642 (2d Cir.1983). Although the Commissioner is free to accept or reject the testimony of any witness, a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir.1988)(citing *Carroll*, 705 F.2d at 643). The ALJ's findings must be consistent with the other evidence in the case. *See Id.* at 261. After reviewing the ALJ's decision, the court concludes that the ALJ's credibility finding, that plaintiff's statements concerning his impairment are not entirely credible, is set forth with sufficient specificity.

In evaluating subjective symptoms such as pain, a claimant must first demonstrate the existence of a medically determinable impairment that could reasonably be expected to produce the symptom. After such an impairment has been identified, the intensity and persistence of the claimant's pain are evaluated based on all available evidence. The claimed pain will not be rejected simply because the objective medical evidence does not support the claim. Other factors which will be considered include the claimant's medical history, diagnosis, daily

activities, prescribed treatments, efforts to work and any functional limitations or restrictions caused by the pain. *See* 20 C.F.R. § 404.1529. In addition,

in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work ....

Social Security Ruling ("SSR") 95–5p, 1995 WL 670415 (S.S.A.).

A review of the ALJ's decision indicates that he did not fully credit plaintiff's subjective complaints for several reasons:

Athough [plaintiff] alleges that he has suffered from incapacitating pain and respiratory problems since 1984, he did not file for disability-based payments until 1994. His complaints of groin pain have been sporadic and not persuasive of a persistent, severe condition. [The consultative physician], who found no evidence of testicular pathology, described the [plaintiff's] complaints as "quite atypical," and questioned their legitimacy .... The [plaintiff's] asthma, which is referred to as "well controlled" by [the consultative physician], has been treated on a purely outpatient basis. [The consultative psychiatrist] was unequivocal in his estimation of the feigned nature of [plaintiff's] memory loss and disorientation.

(R. 20.) The ALJ also described plaintiff as goal-directed in his hospital visits and at the hearing. (*See Id.*) The court concludes that the ALJ complied with the requirements of SSR 95–5p.

■ The Commissioner, through the ALJ is charged with evaluating the credibility of all witnesses, including plaintiff. *See Gallagher v. Schweiker,* 697 F.2d 82, 84 (2d Cir. 1983). The ALJ is not bound by plaintiff's subjective complaints concerning the degree of impairment. *See Aponte v. Secretary of HHS,* 728 F.2d 588, 591–92 (2d Cir.1984).

In this case, plaintiff contends that the record medical evidence supports his claim of debilitating lower abdominal and testicular pain. A review of the record, however, reveals that plaintiff complained of debilitating pain only sporadically. Plaintiff complained of lower abdominal and testicular pain in 1987 and not again until 1993. Plaintiff sought treatment at the Emergency Room nine times in 1994, but complained of pain on urination only once. In October 1996, plaintiff's treating physician reported that plaintiff had been seen by a urologist but was unaware of the diagnosis. Plaintiff did not file the urologist's report. Although the consultative physician reported that plaintiff claimed to experience pain upon examination, the consultative physician was not convinced that plaintiff's complaint of pain was genuine.

■ The Second Circuit has held that an ALJ may rely both on what a medical report says and what it does not say. *Diaz v. Shalala,* 59 F.3d 307, 315 (2d Cir.1995); *Dumas v. Schweiker,* 712 F.2d 1545, 1553 (2d Cir.1983). Here, the ALJ found that despite plaintiff's complaints of chronic persistent pain, he sought medical treatment only sporadically since 1984. The ALJ was permitted to draw a negative inference from the lack of treatment. *See Arnone v. Bowen,* 882 F.2d 34, 39 (2d Cir.1989) ("the Secretary properly attributed significance to [the plaintiff's] failure to seek medical attention ... [The] failure to present any medical evidence from that period seriously undermines his contention that he was continuously disabled during that time.").

The ALJ has considered plaintiff's sporadic history, the infrequency of prescribed treatment, the absence of any medical evidence from the examining urologist and the absence of objective evidence that plaintiff cannot perform sedentary work because of chronic pain. The court concludes that the ALJ's finding that plaintiff is not disabled by chronic pain is supported by substantial evidence. Accordingly, plaintiff's motion for summary judgment should be denied.

III. *Substantial Evidence in Support of ALJ's Decision*

■ Defendant argues that the Commissioner's decision is supported by substantial

evidence and should be affirmed. As an initial matter, the court notes that the reports prepared by the consultative physician are not signed. Although neither party has addressed this fact, the regulations provided that unsigned reports may not be used to deny benefits. *See* 20 C.F.R. § 416.919o(b)(1). The court has reviewed the record and concludes that the decision of the Commissioner denying SSI benefits in this case is not dependant on the unsigned consultative reports. Although the ALJ referred to the consultative reports in his assessment of plaintiff's claims of testicular and lower abdominal pain, the ALJ's conclusion that plaintiff's pain is not disabling is supported by the absence of objective medical evidence from the examining urologist, the sporadic treatment and the ALJ's overall assessment of plaintiff's credibility. The court concludes, therefore, that the denial of SSI benefits was not based upon the unsigned consultative reports.

Once a claimant demonstrates that he cannot perform his past relevant work, the ALJ bears the burden of demonstrating that jobs exist in sufficient numbers in the national economy which the claimant can perform. *See Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). If the claimant exhibits only exertional impairments, the ALJ can determine whether he is disabled by consulting the grid. *See* 20 C.F.R. § 416.920(f).

▮ In the present case, the ALJ found that plaintiff was unable to perform his past relevant work. (R. 22.) Thus, the ALJ bore the burden of demonstrating that plaintiff had the residual functional capacity to perform substantial gainful activity and to identify such jobs. The ALJ determined that plaintiff retained the residual functional capacity to perform sedentary work.

Sedentary work is defined in the regulations as

involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 416.967(a). Sedentary work is further defined in SSR 83–10.

By its very nature, work performed primarily in the seated position entails no significant stooping. Most unskilled jobs require good use of the hands and fingers for repetitive hand-finger actions. "Occasionally" means occurring from very little to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8–hour workday, and sitting should generally total approximately 6 hours of an 8–hour workday.

*Id.* SSR 83–10, 1983 WL 31251 (S.S.A.).

Where a claimant is unable to perform the full range of sedentary work because of exertional and nonexertional impairments, reliance on the grid as the exclusive framework for making a disability determination is inappropriate. *See Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir.1986). If the ALJ determines, however, that a claimant's nonexertional impairments do not preclude him from performing the full range of sedentary work, he may rely exclusively on the grid. *See Id.* Thus, the ALJ must determine whether a claimant's nonexertional impairments "significantly limit the range of work permitted by his exertional limitations." *Id.* "Significantly limit" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* at 606.

The residual functional capacity assessments completed by the agency and by plaintiff's treating physician indicate that plaintiff can perform work at the sedentary level of exertion if he avoids constant exposure to dust. (*See* R. 80–83, 106, 151.) The ALJ determined that this environmental restriction did not significantly "narrow the range of work [plaintiff] is capable of performing." (R. 22.) The ALJ applied the grid to reach a finding that the plaintiff was not disabled at

any time prior to the date of decision. (*See* R. 22.) The court concludes that the ALJ properly relied on the grid to reach a finding that plaintiff was not disabled. *See Pickering v. Chater,* 951 F.Supp. 418, 427–28 (S.D.N.Y. 1996) (court held that plaintiff's asthma did not prevent exclusive reliance on the grid where plaintiff's medical reports were normal and only restriction on plaintiff's ability to work was avoidance of pulmonary irritants); *Crean v. Sullivan,* No. 91 Civ. 7038(PKL), 1992 WL 183421, at *5 (S.D.N.Y. July 22, 1992) (holding reliance on the grid proper where claimant's nonexertional impairments, limited right shoulder range of motion and partial hearing loss, did not significantly compromise range of work for which claimant was otherwise qualified). The court concludes that the ALJ's determination that plaintiff was not disabled was supported by substantial evidence and, thus, that defendant's motion for an order affirming the Commissioner's decision should be granted.

## CONCLUSION

For the reasons stated above, defendant's Motion for Order Affirming the Decision of the Commissioner [Doc. # 14] is GRANTED. Plaintiff's Motion for Summary Judgment [Doc. # 11] is DENIED.

The parties are free to seek the district judge's review of this recommendation. *See* 28 U.S.C. § 636(b) (written objection to ruling must be filed within ten days after service of same); Fed.R.Civ.P. 6(a), 6(e) & 72; Rule 2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989) (failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).