Hannah CRAVEN, Plaintiff,

v.

Kenneth APFEL, Commissioner of Social Security, Defendant.

No. 98Civ. 7326 (LAP)(AJP).

United States District Court,
S.D. New York.

July 12, 1999.

Josephine Gottesman, New York City, for plaintiff.

Susan D. Baird, Asst. U.S. Atty., New York City, for Defendant.

### ORDER ADOPTING REPORT AND RECOMMENDATION

PRESKA, District Judge.

Plaintiff Hannah Craven brings this action pursuant to section 205(g) of the Social Security Act, 45 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security denying her disability benefits. Both parties cross-moved for judgement on the pleadings pursuant to Fed.R.Civ.P. 12(c). On May 18, 1999, Magistrate Judge Peck issued a report and recommendation (the "Report"), which recommended that I grant plaintiff's motion to the extent that the case be remanded to the Commissioner

for further development of the record, and that the Government's motion be denied. Plaintiff submitted her objections to the Report on May 27, 1999, and on June 14, 1999 the Court received the Government's response to plaintiff's objections.

Having reviewed the Report *de novo* pursuant to Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1)(C), as well as having considered plaintiff's objections thereto and the defendant's response, I find the Report well-reasoned and thoroughly grounded in the law. I agree with the Magistrate Judge that the Administrative Law Judge ("ALJ") failed to "affirmatively develop the record," *see Tejada v. Apfel,* 167 F.3d 770, 774–75 (2d Cir.1999), and that further development is required. Specifically, I agree with the Magistrate Judge that additional medical evidence is necessary and that the ALJ should have questioned the plaintiff more fully on her subjective inability to concentrate or to complete tasks in a timely, work-like manner. (*See* Report at 28–31). In short, I find that the extent of plaintiff's injuries is not clear from the record and that the ALJ failed to develop the record sufficiently to make an appropriate decision in either direction. *See Rosa v. Callahan,* 168 F.3d 72, 82–83 (2d Cir.1999). Accordingly, plaintiff's objection that I should reverse the Commissioner's final decision and remand solely for the calculation of benefits is without merit, as are her other objections.

Having reviewed the Report thoroughly and finding it well reasoned and grounded in law, and finding plaintiff's purported objections to be without merit, it is hereby ORDERED that the report and recommendation is adopted in its entirety.

Plaintiff's motion on the pleadings is therefore granted to the extent it requests a remand to the Commissioner for further fact-finding, and the Commissioner's motion is denied. The Clerk of the Court shall mark this matter as closed and any pending motions denied as moot.

## REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

Plaintiff Hannah Craven brings this action, pursuant to section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") to deny her disability benefits. Both parties have cross-moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).

For the reasons set forth below, because the Administrative Law Judge failed to adequately develop the medical record, I recommend that the Court grant Craven's motion for judgment on the pleadings to the extent of remanding the case to the Commissioner to further develop the record, and deny the Commissioner's cross-motion.

### PROCEDURAL BACKGROUND

On October 12, 1996, Craven filed an application for Social Security Supplemental Security Income ("SSI") benefits. (Administrative Record filed by the Commissioner [hereafter, "R."] 62–64.) Craven's application was denied on November 29, 1996, and again on reconsideration on May 29, 1997. (R. 51–52, 56–57.) At Craven's request (R. 58), a hearing was held before an administrative law judge ("ALJ") on October 8, 1997. (R. 28–48.) On December 29, 1997, the ALJ issued his decision finding that Craven was not disabled. (R. 11–19.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Craven's request for review on August 19, 1998. (R. 5–7.) This action followed.

### FACTS

#### A. The Hearing Before the ALJ

On October 8, 1997, the ALJ held a hearing on Craven's SSI application. (R. 28–48.) Present at the hearing was Craven and her brother Alex Craven, who was there "partly for moral support" and to

represent Craven, although he had no knowledge of Social Security regulations. (R. 30.) Craven waived her right to an attorney at the hearing because she had been unable to find an attorney. (R. 30–31.)

### 1. *Craven's Testimony*

At the time of the hearing Craven was 43 years old. (R. 34.) Craven had a Bachelor of Science degree from City University. (R. 34.) Craven claimed that her disability began on December 31, 1992. (R. 31.)

Craven worked at the Marine Midland Bank from 1981 to 1992 and was able to sustain her position because although she could only perform once in a while, in the 1980's the bank could afford to overstaff, and she installed "some computer programs that were very useful, it was worth it to them." (R. 41, 77, 83.) However, when the bank transferred Craven to sales, she "didn't do anything for two years," and was fired for not selling bank products and because she did not get along with her supervisor. (R. 36, 41, 77, 83.) The year before Craven was transferred to sales work, she had her own office and could close the door, but she "fell asleep at work quite a bit." (R. 36–37.) She would "often stay [at work] until 9:00 at night . . . just because [she] couldn't get around to getting up. And then [she] would end up working on things that nobody had asked [her] to do that were totally repetitive." (R. 37.)

The year after Craven was fired, in 1993, Craven earned $9,861.41 in severance pay; in 1995 and 1996 she earned $2,469.50 and $4,215.00 respectively from part-time work. (R. 32–33, 67.)

At the time of the hearing, Craven had a part-time job at Hunter College, from which she had been fired when her boss was on vacation, but was rehired when her boss returned. (R. 44–45, 147.) Craven's boss did not give Craven her old job back, but gave Craven the chance to train a new person and was going to give her some projects to work on as long as Craven's "mood stays calm." (R. 45.)[1] Craven also was taking courses part-time at Hunter College. (R. 77, 104.)

Craven stated that she wanted to work and can work part time, but that with "Manic Bipolar" she has "good days and bad days," so she cannot always work. (R. 33, 38–39.) She has "computer skills," "financial skills," and "economic skills" and felt that without her psychological problems she could be "making a lot of money." (R. 38.) But "some days [her] brain doesn't even work," so she has "to have employers who can't rely, don't rely on [her] every single day of the week." (R. 33.)

Craven's "biggest problem is fatigue [a]nd it doesn't prevent [her] from working at all." (R. 34.) Craven explained that she is "exhausted, and a couple of days a week [she] often [does not] leave the

---

**1.** Sandra LaPorta, Director of the Office for Disabled Students at Hunter College, submitted a letter dated September 30, 1997 to the ALJ in which she described Craven's work habits:

> When I hired Hannah Craven in 1995 I was able to give her a mostly private office, a computer which few people shared, and a job assignment that required little interaction with co-workers. Her work during this period was excellent.
> After a year, normal budget constraints required that I assign more people to share that office and computer and that her work involve standard interaction with co-workers.

> Clearly the results of this were negative to my office. In spite of an obvious effort to control herself, Hannah had frequent temper tantrums negatively disturbing the entire office, inability to work more [than] 2–3 hours a day; tardiness; and general lowering of work quality. It is also possible that these outbursts might have occurred under any circumstance.
> I value Hannah's work when she is able to do it. Had budget constraints allowed it I would have moved her to a more appropriate office.
> (R. 147.)

house. But ... [her] medication is a little bit more helpful. But before [she] took the medication, a lot of times, [she] wouldn't even leave the house.... [she] would just lie there, just feeling like in between awake and asleep, sort of like in a nightmare situation, just—And if [she] didn't do that, [she] didn't recover enough to go back out into the world on the other days." (R. 36.)

Craven's other problem is that she "never know[s] when [she is] going to be hit with things like rage, or disorientation, or [her] brain doesn't go to work." (R. 35.) Craven said that "[m]ost of the time, [she is] a nice tolerant person, and [she] get[s] along well with people.... But sometimes something that never bothered [her] before will all of a sudden bother [her] and [she] will blow up." (*Id.*) She gets "hysterical" and starts "screaming, and yelling, and using bad language, and running around the office telling everybody what a bad person everybody is .... And [she] never know[s] when it is going to happen ...." (*Id.*)

Craven stated on her SSI application that her condition keeps her from working because she "need[s] a lot of sleep and time away from people doing nothing in order to function normally for a short time. [She] need[s][a] working environment which does not cause [her] to have temper tantrums and which lets [her] set [her] own schedule and work isolated. [She] need[s] a computer to avoid making mistakes. [She] also need[s] lots of time away from work to manage tasks such as taking care of [herself]. [She] can't make decisions very well." (R. 73, 90, 97.) She also stated that she "make[s] a huge number of mistakes so it takes [her] a very long time to complete assignments until they are programmed in a computer. [She] blurt[s] out things that are wrong or out of context or mean. If [she] work[s] too many hours [she] start[s] doing things that are repetitive and unnecessary and not what [she's] supposed to be doing." (R. 73.)

When the ALJ asked Craven why she could not work in a secluded setting she replied that she could under certain conditions:

That's the best thing—is for me to work in a secluded section and to make my own hours. In other words, to— Sometimes I'm, I can work at 10:00 at night. Sometimes I can work at 6:00[in] the morning. It really depends. And not to have somebody rely on me being at a certain time....

. . . .

If, if I could do certain things that let me work when I can work, and have my own computer, and have privacy, and nobody bothering me, and I don't change the system once I set it up, and if they need me on a certain day and I'm not able to go in on that certain day— I'm not even going to function on that certain day, they don't say, "Oh, shoot," you know, "we needed you this day."— and if they don't mind me occasionally going into, you know—

(R. 39–40.)

At the time of the hearing Craven was taking Valproic Acid and Depakote. (R. 39.) Craven said that when she first took Depakote it made her very lethargic, but alleviated her paranoia to the point where she made friends with a heroin addict in a park and gave him $4,000 which she borrowed through her credit card but does not have money to repay. (R. 41–43.)

When the ALJ asked Craven, "So, you've only been in treatment since February?," Craven answered, "Yeah, I was going to see another doctor before that. But it was a private doctor, and I couldn't afford it. So, I went to Bellevue and—," at which point the ALJ cut Craven off in mid-sentence. (R. 46.) Craven testified that she had never been hospitalized for psychiatric problems, but that she had psychotherapy as a teenager and again in her twenties, to no avail. (R. 34, 46.)

## 2. Craven's Brother's Testimony

Although Alex Craven appeared in part as his sister's representative (R. 30), he also made some observations about her illness. Alex Craven stated that his sister "can work well because she's very bright. And there's some cases where people will put up with all kinds of things and make situations right for her.... But when it comes to working with other people, or being with other people a great length of time, it becomes too difficult." (R. 33.)

Alex Craven also noticed that the medical reports in his sister's record revealed different diagnoses in October 1996 than in spring 1997, which was symptomatic of his sister's altered states: "it struck me immediately that this is a very good way of looking at my sister—that you don't know who you're going to get on any given day. And, in fact, that the interviewers here got two different people.... And for a job that requires ... a college degree ..., this behavior is unacceptable." (R. 38.) Alex Craven also noted that "if she could find a job where somebody said you're a brilliant woman. We'll give you some tasks. And we don't care what the heck—... you do, as long as you pick, pick away at them—... this would be a very effective job." (R. 39–40.) Craven agreed. (Id.)

## B. The Medical Evidence

The medical evidence consists of a report from Craven's treating psychologists Dr. Henry Cheng (R. 148–51) and Robert Broad, Ph.D. (R. 113–14), consultative examiners' reports from psychologist Dr. E. Hoffman (R. 104–05), psychiatrist Dr. R. King (R. 115–17), and psychiatrist Dr. Renee Ravid (R. 131–33), and non-examining consultants' reports from Dr. Joseph Minola (R. 118–30) and Dr. Juan C. Echevarria (R. 134–46).

2. In Craven's request for an administrative hearing she stated that "[s]ocial security did not contact any of my Drs., either Dr. Strahan or Dr. Broad." (R. 58.) Craven also listed

## 1. Treating Physicians Reports

Dr. Henry Cheng, Craven's doctor at Bellevue Hospital, submitted a general medical report dated September 26, 1997. (R. 148–51.) Dr. Cheng reported that he first saw Craven on April 9, 1997 and had continued to see Craven biweekly for psycho-pharmacological visits and once a week for psychotherapy. (R. 148, 151.) Dr. Cheng noted that Craven had a "long history of emotional, interpersonal and occupational difficulties." (R. 148.) Craven was treated with psychotherapy in her late teens and early twenties for anxiety and depression, and was at that time diagnosed with Borderline Personality Disorder. (Id.) In 1994–95, Craven had a manic episode from which she had a spontaneous remission. (Id.) Then in 1996 a private psychiatrist who Craven was seeing from September 1996 to January 1997 diagnosed Craven with Attention Deficit Disorder -Inattentive Type, and treated Craven with Ritalin and Depakote. (Id.) Dr. Cheng took Craven off Ritalin, and Craven reported "significant improvement of lability and irritability." (R. 151.) Dr. Cheng reported that Craven's "current symptomology" included "severe mood swings, irritability, poor frustration tolerance, volatile interpersonal relationships, and fatigue. She is also prone to paranoid ideation." (R. 148.) Dr. Cheng diagnosed Craven with "Bipolar Disease—Manic and Borderline Personality Disorder." (R. 148, 151.) Dr. Cheng prescribed Valprioc for Craven. (R. 150.) Dr. Cheng described Craven's difficulties as "longstanding and deep-seated, and will require time for meaningful change to occur." (R. 151.) Dr. Cheng's prognosis was "quite favorable" because Craven's "motivation and commitment to the treatment are excellent." (Id.)

The record contains an undated report from psychologist Robert Broad, Ph.D., who tested Craven for learning disorders.[2]

Dr. Broad as a treating physician on her SSI application. (R. 74.) In her brief to this Court, however, Craven's counsel referred to Dr. Broad's report as "a report of a consulta-

(R. 113.) Dr. Broad found that Craven met the criteria for Attention Deficit Disorder—Inattentive Type, since Craven described herself as:

> always feeling restless, difficulty remaining satisfied, easily distracted, difficulty in waiting her turn, a tendency to blurt out answers before a question is completed, difficulty in completing tasks and most importantly, difficulty in sustaining attention in tasks. She frequently shifts from one task to another, interrupts others in conversation, has difficulty attending in conversation, loses important things and forgets [a lot]. She further describes herself as impatient, rash when making decisions and always feels on the go, as if driven by a motor.

(R. 113, 114.) Dr. Broad also found that Craven "performed erratically on objective measures of attention and concentration," and the test results "suggest a weakness" in the areas of "attention, mental flexibility and visual scanning." (R. 113.) Dr. Broad recommended that Craven would benefit from: "1. Extended time for taking examinations 2. Permission to tape lectures 3. One on one consultation with a learning specialist, perhaps associated with the learning disabilities program at [Hunter] [C]ollege who can assist her with study [and] 4. Counseling regarding the nature of her Attention Deficit Disorder and ways of coping with this disorder." (R. 114.)

### 2. *Consultative Medical Reports*

Dr. King, a psychiatrist at HS Systems, Inc., evaluated Craven on October 31, 1996. (R. 115–17.) Dr. King reported that Craven was given Ritalin and found that it effectively increased her energy. (R. 115.) Craven said that since childhood, she tends to sleep 12 hours a night and stays in bed all day one or two days a week. (*Id.*) Craven's symptoms included making simple mistakes and getting irritable with people. (*Id.*) She did not report any history of hallucinations, delusions or suicidal behavior. (*Id.*) Craven reported that "she first sought psychiatric treatment at age 18 . . . [and] saw a psychotherapist for several years but does not feel she was helped." (*Id.*)

Dr. King reported that Craven established a "fair rapport, was in no acute distress" and was "cooperative." (*Id.*) Craven's "[s]peech was coherent and relevant, no thought disorder. Affect was fairly well modulated, friendly, appropriate. Mood was euthymic, not significantly depressed or anxious. There were no hallucinations, delusions, suicidal ideation, ideas of reference or paranoid trends elicited." (R. 115–16.) Craven's intellectual functioning was above average. (R. 116.) Craven's insight and judgment were fair, her attention and concentration adequate, her memory was grossly intact, and she was oriented. (*Id.*)

Dr. King diagnosed Craven with "[d]ysthymic disorder with anxiety, mild degree," but ruled out Attention Deficit Disorder of adulthood by history. (*Id.*) Dr. King opined that Craven "might benefit from psychiatric treatment" and her prognosis was "fair." (R. 117.) Dr. King further opined that Craven "has a satisfactory ability to understand, carry out, and remember instructions, and a satisfactory ability to respond appropriately to supervision, co-workers, and work pressures, in a work setting." (R. 116.)

E. Hoffman, Ph.D., a psychologist at HS Systems, also evaluated Craven on October 31, 1996. (R. 104–05.) Dr. Hoffman reported that Craven takes college courses, takes public transportation independently, cooks, does laundry and shops for herself. (R. 104.) Dr. Hoffman found that "[o]verall, [Craven] shows a very adequate level of adaptive functioning." (*Id.*) Dr. Hoffman observed that Craven was motivated, friendly and cooperative, able to follow test directions, and had "no signs

---

tion attended by [Craven] performed by Robert D. Broad, Ph.D." (Craven Br. at 5.) Since Craven told the Administration that Dr. Broad was a treating physician, this Court assumes that he was.

of high distractibility." (*Id.*) Dr. Hoffman administered the Wechsler Adult Intelligence Scale–Revised. (*Id.*) Craven attained a verbal IQ of 134, a performance scale IQ of 138, and a full-scale IQ of 139, which indicated "superior intellectual functioning." (R. 105.) Dr. Hoffman concluded that Craven "shows no intellectual deficits ... [and] shows the ability to achieve competitive employment and to manage her finances independently." (*Id.*) Dr. Hoffman recommended that Craven "be encouraged to seek full-time competitive employment" and felt that her "prognosis is considered excellent." (*Id.*)

Dr. Renee Ravid, a psychiatrist, evaluated Craven on April 17, 1997. (R. 131–33.) Dr. Ravid reported that Craven was a "poor historian and has difficulty giving a cogent history." (*Id.*) Craven nevertheless reported that she "began psychiatric treatment at age 17 and has been in treatment off and on since then.... She has been suffering from fatigue since age 3, and having mood swings, she sleeps a lot and has nightmares." (*Id.*) Dr. Ravin found that Craven had a "rather childlike demeanor and presentation," and her speech was "extremely rapid, loquacious, frequently interrupts the interviewer, [and] tends to be somewhat digressive." (*Id.*) Craven's mood was "somewhat labile" but her affect was bright. (R. 132.) Dr. Ravin reported that Craven "describes herself as being 'exceedingly intelligent', that she is a 'genius' at certain things, such as presentation of statistics. There is a grandiose flavor to her." (*Id.*) Craven was "alert and oriented," her concentration was good, but her "[i]nsight and judgment are somewhat limited." (*Id.*) In Dr. Ravid's opinion, Craven suffered from a "mood disorder characterized by mood lability, depression, fatigue, grandiosity, pressured and digressive speech." (*Id.*) Dr. Ravin diagnosed Craven with "bipolar disorder, n.o.s." (*Id.*) Dr. Ravin felt that a "review of past psychiatric treatment and past and current school reports would prove helpful." (R. 133.) According to Dr. Ravin, Craven "appear[ed] able to budget cash benefits" and her "[p]rognosis is fair." (*Id.*)

### 3. *Residual Functional Capacity Assessments*

Dr. Joseph Minola and Dr. Juan C. Echevarria reviewed Craven's medical records and completed Mental Residual Functional Capacity Assessments on November 26, 1996 and May 8, 1997 respectively. (R. 118–30, 134–46.) Dr. Minola and Dr. Echevarria both found that Craven was not significantly limited in the categories of "Understanding and Memory," "Sustained Concentration and Persistence," "Social Interaction" and "Adaptation." (R. 118–19, 134.) Dr. Minola and Dr. Echevarria determined that Craven's impairments did not meet or equal a listed impairment, but that her impairments fit into the affective disorders category. (R. 122, 138.) Within that category, Dr. Minola opined, that Craven had "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by ... Dysthymic Disorder." (R. 125.) Dr. Echevarria opined that Craven had "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidence by ... [d]epressive syndrome characterized by ... [a]nhedonia or pervasive loss of interest in almost all activities, ... [a]ppetite disturbance with change in weight, [and] ... [s]leep disturbance" (R. 141)—an inexplicable finding since there is no evidence in the record that Craven suffered appetite loss or weight gain or loss. Dr. Minola found that Craven was only slightly limited in the "Restriction of Activities of Daily Living," while Dr. Echevarria found no limitations; both doctors found slight limitations in the "Difficulties in Maintaining Social Functioning" categories; Dr. Minola found Craven often limited in the category of "Deficiencies of Concentration, Persistence or Pace Resulting in Failure to Complete tasks in a Timely Manner (in work settings or elsewhere)," while Dr. Echevarria found her seldom limited in that category; and

both doctors found Craven never limited in the category of "Episodes of Deterioration or Decompensation in Work or Work–Like Settings Which Cause the Individual to Withdraw from that Situation or to Experience Exacerbation of Signs and Symptoms (which may Include Deterioration of Adaptive Behaviors)." (R. 129, 145.)

### D. The ALJ's Decision

On December 29, 1997, the ALJ issued his written decision. (R. 11–19.) The ALJ found that Craven had "not engaged in substantial gainful activity since December 21, 1992," and that Craven has "dysthymic disorder with anxiety and a bipolar disorder, impairments which are severe but which [does] not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (R. 18; see also R. 15.)

The ALJ reviewed and summarized the reports by Dr. King, Dr. Hoffman, Dr. Ravid and Dr. Cheng. (R. 16–17.) The ALJ stated that Craven rarely received medical treatment from December 31, 1992 to the present, and that she began treatment for her condition on February 21, 1997 (R. 17), even though Craven stated that she had seen a private psychologist prior to February 1997 (R. 46). The ALJ determined that Craven demonstrated that she is employable, and by "her own statement, she has taken additional college courses and works on a part time basis at Hunter College. Furthermore, [Craven] reported that she did not leave her job due to a disabling condition, but due to lay-offs." (R. 17.) This conclusion is also not supported by the record, since Craven said that she was fired from the bank because she did not get along with her supervisor and was unable to sell any bank products, and fired from Hunter because she did not get along with co-workers. (R. 36, 41, 45, 83, 92.) The ALJ also noted that Craven earned money in 1995 and 1996 for part-time work. (Id.) The ALJ found Craven's testimony about her inability to work "not entirely credible" in light of her assertions

concerning her ability to work and her "medical history, or lack thereof." (R. 18–19.) The ALJ believed that Craven's subjective complaints were not supported by the objective evidence. (R. 18.)

The ALJ concluded that Craven's impairments did not prevent her from performing her past work as a data processor. (R. 18–19.)

### ANALYSIS

## I. THE APPLICABLE LAW

### A. The Definition of Disability

A person is considered disabled for Social Security benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir.1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir.1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir.1996); Vega v. Commissioner of Soc. Sec., 97 Civ. 6438, 1998 WL 255411 at *5 (S.D.N.Y. May 20, 1998) (Peck, M.J.); Pickering v. Chater, 951 F.Supp. 418, 422 (S.D.N.Y.1996) (Batts, D.J. & Peck, M.J.); Burris v. Chater, 94 Civ. 8049, 1996 WL 148345 at *2 (S.D.N.Y. April 2, 1996); DeJesus v. Shalala, 94 Civ. 0772, 1995 WL 812857 at *4 (S.D.N.Y. June 14, 1995) (Peck, M.J.), report & rec. adopted, 899 F.Supp. 1171 (S.D.N.Y.1995); Francese v. Shalala, 897 F.Supp. 766, 769 (S.D.N.Y.1995); Walzer v. Chater, 93 Civ. 6240, 1995 WL 791963 at *6 (S.D.N.Y. Sept.26, 1995) (Kaplan, D.J. & Peck, M.J.); Coleman v. Shalala, 895 F.Supp. 50, 53 (S.D.N.Y.1995). The combined effect of all impairments must be of such severity that the person

is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful

work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); *see, e.g., Rosa v. Callahan,* 168 F.3d at 77; *Balsamo v. Chater,* 142 F.3d at 79; *Vega v. Commissioner of Soc. Sec.* 1998 WL 255411 at *6; *Pickering v. Chater,* 951 F.Supp. at 422–23; *Burris v. Chater,* 1996 WL 148345 at *2; *DeJesus v. Shalala,* 1995 WL 812857 at *4; *Walzer v. Chater,* 1995 WL 791963 at *6.

■ In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983) (per curiam); *see also, e.g., Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir. 1999); *Carroll v. Secretary of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir. 1983); *Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at *6; *Pickering v. Chater,* 951 F.Supp. at 423; *Walzer v. Chater,* 1995 WL 791963 at *6; *DeJesus v. Shalala,* 1995 WL 812857 at *4.

■ A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination. *E.g., Rosa v. Callahan,* 168 F.3d at 77; *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998); *Perez v. Chater,* 77 F.3d at 46; *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991); *Mongeur v. Heckler,* 722 F.2d at 1038; *Dumas v. Schweiker,* 712 F.2d 1545, 1550 (2d Cir.1983); *Fernandez v. Apfel,* 97 Civ. 6936, 1998 WL 603151 at *7 (S.D.N.Y. Sept.11, 1998) (Peck, M.J.); *Vega v. Commissioner of Soc. Sec.,* 1998

WL 255411 at*6; *Pickering v. Chater,* 951 F.Supp. at 423; *Burris v. Chater,* 1996 WL 148345 at *2; *Walzer v. Chater,* 1995 WL 791963 at *6; *Francese v. Shalala,* 897 F.Supp. at 770; *Coleman v. Shalala,* 895 F.Supp. at 54; 42 U.S.C. § 405(g). "Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision." *Burris v. Chater,* 1996 WL 148345 at *3; *see also, e.g., Fernandez v. Apfel,* 1998 WL 603151 at *7; *Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at*6; *Francese v. Shalala,* 897 F.Supp. at 770.

The Supreme Court has defined "substantial evidence" as " 'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *accord, e.g., Tejada v. Apfel,* 167 F.3d 770, 773–74 (2d Cir.1999); *Rosa v. Callahan,* 168 F.3d at 77; *Perez v. Chater,* 77 F.3d at 46; *Fernandez v. Apfel,* 1998 WL 603151 at *8; *Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at *6; *Pickering v. Chater,* 951 F.Supp. at 423; *Walzer v. Chater,* 1995 WL 791963 at *6.

■ However, the Court will not defer to the Commissioner's determination if it is " 'the product of legal error.' " *E.g., Fernandez v. Apfel,* 1998 WL 603151 at *8; *Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at *6; *Burris v. Chater,* 1996 WL 148345 at *3; *Francese v. Shalala,* 897 F.Supp. at 770.

■ The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987). The Second Circuit has articulated the five steps as follows:

■ First, the Secretary [now, Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. [2] If he is not, the Secre-

tary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. [5] Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982); *accord, e.g., Brown v. Apfel*, 174 F.3d 59, 1999 WL 183758 at *3; *Tejada v. Apfel*, 167 F.3d at 774; *Rosa v. Callahan*, 168 F.3d at 77; *Balsamo v. Chater*, 142 F.3d at 79–80; *Schaal v. Apfel*, 134 F.3d at 501; *Perez v. Chater*, 77 F.3d at 46; *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995); *Vega v. Commissioner of Soc. Sec.*, 1998 WL 255411 at *7; *Pickering v. Chater*, 951 F.Supp. at 423; *Burris v. Chater*, 1996 WL 148345 at *2; *Walzer v. Chater*, 1995 WL 791963 at *6; *DeJesus v. Shalala*, 1995 WL 812857 at *4; *Francese v. Shalala*, 897 F.Supp. at 769; *Coleman v. Shalala*, 895 F.Supp. at 53–54.

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that she cannot return to her past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only her medical capacity but also her age, education and training. *See, e.g., Rosa v. Callahan*, 168 F.3d at 80; *Perez v. Chater*, 77 F.3d at 46; *Berry v. Schweiker*, 675 F.2d at 467; *Vega v. Commissioner of Soc. Sec.*, 1998 WL 255411 at *7; *Pickering v. Chater*, 951 F.Supp. at 423; *Burris v. Chater*, 1996 WL 148345 at *3; *Walzer v. Chater*, 1995 WL 791963 at *7; *DeJesus v. Shalala*, 1995 WL 812857 at *5; *Francese v. Shalala*, 897 F.Supp. at 770.

## B. *The Treating Physician Rule*

■ The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); *see also, e.g., Rosa v. Callahan*, 168 F.3d 72, 78–79 (2d Cir.1999); *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir.1998); *Vega v. Commissioner of Soc. Sec.*, 97 Civ. 6438, 1998 WL 255411 at *7–8 (S.D.N.Y. May 20, 1998) (Peck, M.J.); *Sanchez v. Chater*, 964 F.Supp. 133, 138 (S.D.N.Y.1997); *Toro v. Chater*, 937 F.Supp. 1083, 1091 (S.D.N.Y.1996); *Walzer v. Chater*, 93 Civ. 6240, 1995 WL 791963 at *7 (S.D.N.Y. Sept.26, 1995) (Kaplan, D.J. & Peck, M.J.). Further, the regulations specify that when controlling weight is not given a treating physician's testimony (because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such testimony: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how

consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(d)(2); *see also, e.g., Schaal v. Apfel,* 134 F.3d at 503; *Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at *8; *Walzer v. Chater,* 1995 WL 791963 at *7. The Commissioner's current "treating physician" regulations were approved by the Second Circuit in *Schisler v. Sullivan,* 3 F.3d 563, 568 (2d Cir.1993); *see also, e.g., Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at *8; *Sanchez v. Chater,* 964 F.Supp. at 138; *Walzer v. Chater,* 1995 WL 791963 at *7.

## II. APPLICATION OF THE FIVE-STEP SEQUENCE TO CRAVEN'S CLAIM

### A. Craven Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Craven was engaged in substantial gainful activity after her benefits application on December 31, 1992. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510 (1993); *see also, e.g., Vega v. Commissioner of Social Security,* 97 Civ. 6438, 1992 WL 255411 at *8 (S.D.N.Y. May 20, 1998) (Peck, M.J.); *Pickering v. Chater,* 951 F.Supp. 418, 424 (S.D.N.Y.1996) (Batts, D.J. & Peck, M.J.); *Walzer v. Chater,* 93 Civ. 6240, 1995 WL 791963 at *7 (S.D.N.Y. Sept.26, 1995) (Kaplan, D.J. & Peck, M.J.). The ALJ's conclusion that Craven was not engaged in substantial gainful activity during the applicable time period (R. 15, 18) is not challenged by the parties and is supported by substantial evidence.

### B. Craven Had A Severe Mental Impairment That Significantly Limited Her Ability To Do Basic Work Activities

The next step of the analysis is to determine whether Craven proved that she had a severe physical impairment that "significantly limit[ed][her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Basic work activities" include:

> ... walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling ... seeing, hearing, and speaking ... [u]nderstanding, carrying out and remembering simple instruction ... [u]se of judgment ... [r]esponding appropriately to supervision, co-workers and usual work situations.

20 C.F.R. § 404.1521(b)(1)–(5); *see also, e.g., Vega v. Commissioner of Soc. Sec.,* 97 Civ. 6438, 1998 WL 255411 at *9 (S.D.N.Y. May 20, 1998) (Peck, M.J.); *Pickering v. Chater,* 951 F.Supp. 418, 424 (S.D.N.Y. 1996) (Batts, D.J. & Peck, M.J.); *Walzer v. Chater,* 93 Civ. 6240, 1995 WL 791963 at *7 (S.D.N.Y. Sept.26, 1995) (Kaplan, D.J. & Peck, M.J.). The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims." *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995); *accord, e.g., Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at *9; *Pickering v. Chater,* 951 F.Supp. at 424. If the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken. *See, e.g., Dixon v. Shalala,* 54 F.3d at 1030; *Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at *9; *Pickering v. Chater,* 951 F.Supp. at 424.

The ALJ found that Craven's dysthymic disorder with anxiety and bipolar disorder were severe impairments for the purposes of disability benefits. (R. 15, 18.) This finding is not disputed.

### C. Craven May Have A Disability Listed in Appendix 1 of the Regulations

The third step of the five part test requires a determination of whether Craven had an impairment listed in Appendix 1 of

the regulations. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995); *accord, e.g., Vega v. Commissioner of Soc. Sec.*, 97 Civ. 6438, 1998 WL 255411 at *9 (S.D.N.Y. May 20,1998) (Peck, M.J.); *Pickering v. Chater*, 951 F.Supp. 418, 424 (S.D.N.Y.1996) (Batts, D.J. & Peck, M.J.).

The ALJ summarily stated that Craven's ailments did not meet or equal the severity of any of the listed impairments, deciding that Craven "has no impairment which meets the criteria of any of the listed impairments described in Appendix 1 of the Regulations. ... No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment. Particular consideration has been given to listing 12.00 (Mental Disorders)." (R. 15.)

Craven argues that she meets the listing because the record contains evidence of bipolar disorder and that she "has had the symptomology of both the depressive and manic syndromes." (Craven Br. at 30.) In order to meet the listing for bipolar impairment, and individual must have

A. 3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

(1) [m]arked restriction in activities of daily living or (2) marked difficulties in maintaining social functioning; or (3)[d]eficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or (4)[r]epeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04(A) & (B). The record contains some evidence that Craven could satisfy the requisites of a bipolar impairment. Both Craven's treating physician Dr. Cheng and consultative psychiatrist Dr. Ravid diagnosed Craven with bipolar disorder. (R. 132, 148, 151.) While Dr. Hoffman and Dr. King did not diagnose Craven with bipolar disorder (R. 104–05, 115–17), since Dr. Cheng is Craven's treating physician and the ALJ accepted his finding that Craven had bipolar syndrome, Dr. Cheng's opinion is entitled to more weight. *See* cases cited at pages 181–82 above.

There is also evidence in the record that Craven showed "[d]eficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); [and][r]epeated episodes of deterioration or decompensation in work or work-like settings which cause [her] to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors)." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04(B). Dr. Broad, one of Craven's treating physician's, found that Craven "performed erratically on objective measures of attention and concentration," and the test results suggested a "weakness in [the] areas [of] ... mental flexibility and visual scanning." (R. 113.) In addition, Craven repeatedly testified at the hearing that she could not be relied on to show up at work because some days she is just so fatigued that she "would just lie there" not even watching television. (R. 33, 35, 36.) Craven also testified that at work she would unexpectedly fly into rages which scared her coworkers and bosses. (R. 35, 53.) Her supervisor LaPorta's report that Craven "had frequent temper tantrums negatively

disturbing the entire office, inability to work more [than] 2–3 hours a day [and] tardiness" gives further credence to Craven's complaints. (R. 147.) Further, Dr. Minola found that Craven "often" had "[d]eficiencies of [c]oncentration, [p]ersistence or [p]ace [r]esulting in [f]ailure to [c]omplete [t]asks in a[t]imely [m]anner." (R. 129.)

While there are indications in the record that Craven has a listed impairment, the record is not complete, and the gaps need to be filled in order to determine whether her symptoms are severe enough to qualify as a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04(A) & (B), and/or whether Craven can prevail at stages four and five. *See* Point III below.

## III. *CRAVEN'S APPLICATION SHOULD BE REMANDED FOR FURTHER PROCEEDINGS BECAUSE THE ALJ FAILED TO ADEQUATELY DEVELOP THE RECORD*

A court reviewing an SSI denial "must first satisfy [itself] that the claimant has had a 'full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.' " *Echevarria v. Secretary of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir.1982) (quoting *Gold v. Secretary of Health, Educ. & Welfare,* 463 F.2d 38, 43 (2d Cir.1972)); *see also, e.g., Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.1990); *Hankerson v. Harris,* 636 F.2d 893, 895 (2d Cir.1980); *Vaughn v. Apfel,* 98 Civ. 0025, 1998 WL 856106 at *6 (S.D.N.Y. Dec.10, 1998); *Prentice v. Apfel,* 11 F.Supp.2d 420, 425 (S.D.N.Y.1998); *Dawson v. Apfel,* 96 Civ. 6023, 1997 WL 716924 at *7 (S.D.N.Y. Nov.17, 1997); *Rodriguez v. Apfel,* 96 Civ. 1132, 1997 WL 691428 at *4 (S.D.N.Y. Nov.4, 1997).

■ "Moreover, '[i]t is the rule in our circuit that "the ALJ, unlike a judge in a trial, must ... affirmatively develop the record," in light of "the essentially non-adversarial nature of a benefits proceeding." ' " *Tejada v. Apfel,* 167 F.3d 770, 774–75 (2d Cir.1999); *accord, e.g., Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999); *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir. 1996); *Cruz v. Sullivan,* 912 F.2d at 12; *Echevarria v. Secretary of Health & Human Servs.,* 685 F.2d at 755; *Mejias v. Apfel,* 96 Civ. 9680, 1998 WL 651052 at *5 (S.D.N.Y. Sept.23, 1998); *Maestre v. Appel,* 96 Civ. 8273, 1998 WL 477950 at *4 (S.D.N.Y. Aug.13,1998); *Prentice v. Apfel,* 11 F.Supp.2d at 425; *Dawson v. Apfel,* 1997 WL 716924 at *7; *Rodriguez v. Apfel,* 1997 WL 691428 at *4.

■ Where a claimant appears at the hearing pro se, as Craven did, the ALJ "is under a heightened duty to ' "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." ' " *Cruz v. Sullivan,* 912 F.2d at 11; *accord, e.g., Echevarria v. Secretary of Heath and Human Servs.,* 685 F.2d at 755; *Hankerson v. Harris,* 636 F.2d at 895; *Gold v. Secretary of Health, Educ. & Welfare,* 463 F.2d at 43; *Vaughn v. Apfel,* 1998 WL 856106 at *6; *Mejias v. Apfel,* 1998 WL 651052 at *5; *Maestre v. Appel,* 1998 WL 477950 at *4; *Prentice v. Apfel,* 11 F.Supp.2d at 425; *Dawson v. Apfel,* 1997 WL 716924 at *7; *Rodriguez v. Apfel,* 1997 WL 691428 at *4; *Mann v. Chater,* 95 Civ. 2997, 1997 WL 363592 at *3 (S.D.N.Y. June 30, 1997) (Sotomayor, D.J.).

The ALJ is thus obligated to explore the facts by obtaining relevant medical records and asking questions of a pro se claimant to assist the claimant in developing her case. *See, e.g., Rosa v. Callahan,* 168 F.3d at 80 (ALJ required to request additional records from physicians); *Perez v. Chater,* 77 F.3d at 47 (ALJ required to make " 'every reasonable effort to help [the claimant] get medical reports from [her] own medical sources.' ") (quoting 20 C.F.R. § 404.1512(d)); *Cruz v. Sullivan,* 912 F.2d at 11 (ALJ required to obtain hospital records and ask plaintiff about his asthma attacks); *Echevarria v. Secretary of Health & Human Servs.,* 685 F.2d at 755–

56 (ALJ failed to explore claimant's subjective complaints or obtain necessary medical records); *Mejias v. Apfel,* 1998 WL 651052 at *5 (ALJ required to help claimant get her medical records); *Maestre v. Appel,* 1998 WL 477950 at *4 (ALJ "obligated to explore the facts by asking questions of and obtaining relevant medical records from pro se claimants").

The ALJ's responsibility to assist a claimant in obtaining her medical records carries particular importance in light of the well-established treating physician rule, which requires an ALJ to grant special deference to the opinions of a claimant's treating physicians. (*See* pages 18–19 above.) As Judge Glasser explained:

> [T]hese two principles—the duty to develop a full record and the treating physician rule—do not operate independently of each other. . . . [T]he duty to develop a full record and to assist a pro se plaintiff compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability. . . . Thus, when the claimant appears pro se, the combined force of the treating physician rule and of the duty to conduct a searching review requires that the ALJ make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability. . . . Until he satisfies this threshold requirement, the ALJ cannot even begin to discharge his duties to the pro se claimant under the treating physician rule.

*Peed v. Sullivan,* 778 F.Supp. 1241, 1246 (E.D.N.Y.1991); *see also, e.g., Mejias v. Apfel,* 1998 WL 651052 at *6; *Almonte v. Apfel,* 96 Civ. 1119, 1998 WL 150996 at *7 (S.D.N.Y. March 31, 1998); *Rodriguez v. Apfel,* 1997 WL 691428 at *5. To achieve this goal, an ALJ is authorized to issue subpoenas requiring the production of any evidence relating to a matter under his or her consideration. *See, e.g.,* 42 U.S.C. § 405(d) ("For the purpose of any hearing . . . authorized or directed under this subchapter, or relative to any other matter within the Commissioner's jurisdiction hereunder, the Commissioner of Social Security shall have power to issue subpoenas requiring the attendance and testimony of witnesses and the production of any evidence that relates to any matter under investigation or in question before the Commissioner."); *Treadwell v. Schweiker,* 698 F.2d 137, 141 (2d Cir.1983); *Mejias v. Apfel,* 1998 WL 651052 at *6; *Carroll v. Secretary of Department of Health & Human Servs. of U.S.,* 872 F.Supp. 1200, 1204 (E.D.N.Y.1995).

█ In this case, the ALJ failed in his duty to assist Craven in obtaining the medical records and opinions from two of her treating sources. Craven listed Dr. Alene P. Strahan and Dr. Joseph Martorano as treating physicians on her SSI application (R. 74), yet there are no documents from either source in the record, nor is there any evidence the ALJ contacted the doctors. Craven also stated at the hearing that she had had psychotherapy as a teenager and in her twenties, and that prior to seeing Dr. Cheng she saw a private psychologist. (R. 46.) Yet the ALJ failed to ask the name of the private psychologist or seek the records from that psychologist or from Craven's earlier treatment. In addition, one of the Administration's consulting psychiatrists, Dr. Ravid, stated that in order to render an opinion, "[a] review of past psychiatric treatment and past and current school reports would prove helpful." (R. 133.) Finally, the ALJ did not suggest to Craven that she obtain more information from Dr. Cheng, her current treating psychiatrist, perhaps by subpoenaing him for a hearing. It is black letter law that an ALJ is affirmatively obligated to ask for information from a claimant's treating physician, or at least ask the claimant to get such records and inform her of her right to subpoena her physicians

to testify. (*See* cases cited at pages 24–26 above.)

In addition, the ALJ should have questioned Craven more fully concerning various aspects of her testimony. Despite references in the record to Craven's inability to concentrate (R. 113, 129), the ALJ never questioned Craven about her subjective inability to concentrate, or her inability to complete tasks in a timely, work-like manner. Both issues are important to the determination of whether Craven's bipolar symptoms are severe enough to qualify as a listed impairment. By failing to ask Craven more detailed question about her psychological symptoms at the hearing, and about the mental demands associated with her former job or any other job she might obtain, the ALJ failed to adequately fulfill his affirmative obligation to assist Jones in developing her case. *See, e.g., Hankerson v. Harris,* 636 F.2d at 895–96 (ALJ erred in not questioning plaintiff about subjective symptoms because, "where the medical record before the ALJ contained a number of references to plaintiff's subjective symptoms, it was particularly important that the ALJ explore these symptoms with plaintiff so that the ALJ could effectively exercise his 'discretion to evaluate the credibility of ... (the) claimant ... (in order to) arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant' "); *Mejias v. Apfel,* 1998 WL 651052 at *7 (remanding where "[l]ess than a page of the hearing transcript consists of questions about plaintiff's subjective symptoms, although the Second Circuit has repeatedly emphasized that a claimant's testimony concerning her pain and suffering 'is not only probative on the issue of disability, but "may serve as the basis for establishing disability ..." ' "); *Maestre v. Appel,* 1998 WL 477950 at *8 (ALJ erred in not asking plaintiff questions about an indicated possible mental impairment); *Rodriguez v. Apfel,* 1997 WL 691428 at *6–7 (remanding where "ALJ did not adequately explore [plaintiff's] condition or allow

him to explain all of his medical problems"); *Mann v. Chater,* 1997 WL 363592 at *6 ("By not questioning plaintiff about her subjective claims ..., the ALJ did not satisfy his duty to assist the plaintiff in developing the record so that all of the elements of proving the plaintiff's disability were available to be considered."); *Welch v. Chater,* 923 F.Supp. 17, 20–21 (W.D.N.Y.1996) (the ALJ improperly concluded that plaintiff could work as a cleaner because "[t]he transcript reveals that there was no inquiry regarding the nature of, and the mental demands associated with, plaintiff's [prior] employment"; "[w]hen the plaintiff's impairment is a mental one, special 'care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety... in order to determine if the claimant's mental impairment is compatible with the performance of such work.' ").

Accordingly, because the ALJ failed to adequately develop the record, the Court need not—indeed, cannot—reach the question of whether the Commissioner's denial of benefits was based on substantial evidence at the third through fifth prongs of the five part test.

Accordingly, I recommend that the case be remanded to the Commissioner to further develop the record. As the Second Circuit has explained in similar cases:

> " 'Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.' " .... This case, in our view, is one in which remand for further development of the evidence is the wiser course.... [T]he extent of [claimant's] injuries was not at all clear, and the ALJ failed to develop the record sufficiently to make any appropriate determination in either direction.

*Rosa v. Callahan,* 168 F.3d at 82–83; *see also, e.g., Hankerson v. Harris,* 636 F.2d

188

at 896 (remand "appropriate due to the ALJ's failure to assist this pro se litigant in securing all of the relevant medical testimony."); *Vaughn v. Apfel,* 1998 WL 856106 at *7; *Mejias v. Apfel,* 1998 WL 651052 at *8; *Maestre v. Appel,* 1998 WL 477950 at *8 (remand necessary, where, *inter alia,* "the Court believes that the record needs to be more fully developed on this issue of a possible mental impairment before a disability determination can be made."); *Prentice v. Apfel,* 11 F.Supp.2d at 427 (remand for "amplification of the record on the limited issue of whether plaintiff is disabled by depression"); *Welch v. Chater,* 923 F.Supp. at 20–24 (remand for ALJ to develop the record and "also make findings that compare the mental demands of [plaintiff's prior work] with plaintiff's current [mental] capabilities").

The Court cannot say that Craven would, or would not, prevail on a full record. That decision is for the Commissioner to make in the first instance. A more fully developed record, however, is necessary for that determination.

### CONCLUSION

For the reasons set forth above, I recommend that because the record is incomplete, the case be remanded to the Commissioner for further fact-finding. I therefore recommend that plaintiff Craven's motion for judgment on the pleadings be granted to the extent of ordering that remand, and that the Commissioner's motion for judgment on the pleadings be denied.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMEN-DATION

■ Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Loretta A. Preska, 500 Pearl St., Room 1320, and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Preska. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

May 18, 1999.